NEWFOUND MANAGEMENT CORPORATION, GENERAL PARTNER OF NEWFOUND LIMITED PARTNERSHIP, Plaintiff,

v.

Irvin A. SEWER, Cedric Lewis, Lucinda Anthony, Earle Sewer, Violet Sewer, Jasmine Sewer, Lorel Sewer, Judith Callwood, Leon Callwood, Lorne Callwood, and Persons Unknown Who Have Attempted to Obstruct Construction Work on Plaintiff's Land, Defendants.

Civ. No. 91–315.

District Court, Virgin Islands, Division of St. Thomas and St. John.

March 27, 1995.

Jewel L. Cooper, Tom Bolt & Associates, St. Thomas, U.S.V.I., Alan Garber, Clair A. Carlson, Jr., Mason & Martin, Boston, MA, for plaintiff Newfound Management Corp.

Mario Bryan, St. Thomas, U.S.V.I., for defendant Cedric Lewis.

Vincent Frazer, St. Thomas, U.S.V.I., for all other defendants (The "Sewer Defendants").

## OPINION

BROTMAN, District Judge:

INTRODUCTION

Before the court is an action in trespass, libel, slander, slander of title, intentional interference with business relations, and to quiet title to Parcel 6p and Parcel 7a, Estate Hansen Bay, East End Quarter, St. John, U.S. Virgin Islands, by Newfound Management Corporation, plaintiff. In addition, plaintiff petitions for permanent injunctive relief against Irvin A. Sewer, Lucinda Anthony, Earle Sewer, Violet Sewer, Jasmine Sewer, Lorel Sewer, Judith Callwood, Leon Callwood, and Lorne Callwood (collectively known as the "Sewer defendants"), and co-defendant Cedric Lewis. The underlying issues concerning the boundaries and title to nine parcels of property on the East End including 6p and 7a were tried to the bench from October 3 to October 5, 1994 pursuant to V.I.CODE ANN. tit. 28 § 372.[1] On October

---

1. The statute states,

In any case where any dispute or controversy exists, or may hereafter arise, between two or more owners of adjacent or contiguous lands in the Virgin Islands, concerning the boundary lines thereof, or the location of the lines dividing such lands, either party or any party to such dispute or controversy may bring and maintain an action of an equitable nature in the district court, for the purpose of having

6, 1994, plaintiff submitted supplemental proposed findings of fact and conclusions of law.[2] On October 7, 1994, defendants submitted the same. A jury trial on plaintiff's other claims will follow the entry of a decision on these preliminary matters.

The present land dispute between descendants of old St. John families and a mainland real estate development corporation, Newfound Management Corporation ("Newfound") is truly bitter. In the late 1800s, two families owned the ruggedly beautiful Hansen Bay section of the East End of St. John with its commanding views of bays and the sea. At that time, the land in question belonged to members of the George and Sewer families but had little monetary value; almost one hundred years later, Newfound has purchased sizable tracts of the East End and the land's value has increased manyfold. On the steep, thickly overgrown hillsides where family members once farmed and burros still graze, further development is likely.

Land recording practices and a perplexing mixture of unsurveyed land, conflicting surveys, uncertain genealogies and unprobated estates complicate the title and boundary issues presented to the court. Until the late 1950s, no one had surveyed the perimeters of various parcels on the East End. Prior to that era, deeds and estate documents conveying property merely referred to parcels by using place names or combined letter and numerical designations. These designations appeared on nineteenth-century Danish tax records that listed East End property owners, corresponding holdings and stated acreage measurements, as well as on deeds and other agreements between landowners.[3] The absence of more specific identifying information muddles further the existing disagreements concerning ownership and boundaries of St. John properties. This opinion will seek to locate the disputed parcels, define boundaries and determine title according to the proofs submitted to the court at trial.

After a careful, detailed review of the entire record, including expert testimony and exhibits presented by the parties, the court enters the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

### A. Historical Background:

#### The 1894 and 1913 Agreements

1. In 1893, two families, the Georges and the Sewers, owned the properties in question, part of Hansen Bay in the East End Quarter on St. John. When the families disagreed concerning the sale of specific piece of property, a member of the George family, Wellington George, asked a Danish surveyor, I. Anderson[4], to divide the proper-

such a controversy or dispute determined, and such boundary line or lines, or dividing lines, ascertained and marked by property monuments, upon the ground where such line or lines may be ascertained to be, and established in such action.

V.I.CODE ANN. tit. 28 § 372 (1976); *see also* 1A C.J.S. *Actions* § 129 (1955) (An action to quiet title is an equitable proceeding).

2. The parties also submitted proposed findings of fact and conclusions of law when they filed the joint pre-trial order.

3. The Danish land lists relied on in the court's opinion, catalog the identifying designation of each piece of property, the property owner, the approximate size of each parcel, and the amount of yearly rent due. The Danes collected this information pursuant to colonial law in order to tax property owners and identify eligible voters. *See* Danish Colonial Law of April 6, 1906 § 21, *reprinted in* V.I.CODE ANN., Historical Documents

(Vol. 1, 1967). The relevant provision states in pertinent part:

The elections are to take place according to lists containing the names of the persons entitled to vote, which lists are to be drawn up every year.

As one of the bases for framing these lists, the Tax Commission of each municipality shall ... furnish the chairman of each Elective Board with a list of all such persons who own properties in the district ... The List, besides the names of the owners, must also state the number of each separate property, and the calculated amount of yearly rent.

An earlier parallel provision appears in the 1863 Danish Colonial Law. Colonial Law (1863), *reprinted in* MAJOR POLITICAL & CONSTITUTIONAL DOCUMENTS OF THE UNITED STATES VIRGIN ISLANDS, 1671–1991, at 53 (Paul M. Leary, ed., Univ. of the V.I.1992).

4. Anderson's full name does not appear in the record.

ty so as to avoid such disputes in the future. Pl.'s Ex. 15.

2. On October 19, 1893, Anderson surveyed the property in the presence of two members of each family. His survey was not intended to reflect the exact acreage held by each family; it merely provided an agreed upon boundary.[5] He established compass bearings for the A–B, B–C, and C–D lines. After Anderson drew the boundary, the Georges possessed approximately 66½ acres and the Sewers approximately 78½ acres. Pl.'s Ex. 15.

3. Anderson marked the boundary line with stone piles at points B and C and placed two more stone piles on the boundary between C and D. Pl.'s Ex. 15.

4. Such a survey, using only a compass, was a common practice when a surveyor sought to roughly divide low-priced land. CHARLES B. BREED & GEORGE L. HOSMER, THE PRINCIPLES AND PRACTICE OF SURVEYING 110 (8th ed. 1946).

5. The George–Sewer line divided the property with the George family's holdings north of the line and designated Hansen Bay No. 6a. The Sewer family land lay south of the line and was designated Hansen Bay No. 6b. Pl.'s Ex. 15.

6. Two primary agreements memorialized the identification and transfer of East End Hansen Bay properties, specifically the 1894 and 1913 Agreements. These properly recorded agreements described land ownership interests and many early transfers of property between St. John property owners. These agreements set forth the initial transfers upon which later conveyances depended.

7. In the 1894 agreement recorded in Book U, pages 183–189, the families agreed that Anderson's survey would bind them. Thus the descendants of William George owned the northern parcel and descendants of Eve Marie Sewer owned the southern parcel. Pl.'s Ex. 15.

8. When the families executed the agreement they recognized that Anderson's survey was imperfect. Their agreement stated:

> Whereas the Surveyor was not able to measure the estate properly, as such would cause great expenses and take long time, entirely out of propotion to the value of the estate, it was agreed that the sketch, made by the Surveyor on the 19th October 1893, and the boundary he then fixed, should be binding for all parties. [grammatical and spelling irregularities in original]

Pl.'s Ex. 15.

9. The 1894 agreement split the Sewer holdings to the South, called 6b, into 3 parcels: Martin Sewers' holdings labeled 6c (stated acreage of 4½ acres), Richard Stevens' holdings labeled 6d (stated acreage 9¾ acres), with the remaining acres (stated acreage 64½ acres) held in common by the Sewer heirs. Pl.'s Ex. 15.

10. The 1894 agreement also divided a section of George family property known as Longbay No. 1, sited north of the Anderson line, into two properties: Parcel 6e, owned by the George family and comprising 6⅖ acres, and Parcel 6f, owned by the Sewer

---

**5.** Anderson described the process of drawing the George–Sewer line as follows:

> The survey started by studying of the drawing (which is a copy of Oberst Oxholm's chart over St. John) [an early Danish map of the island] and the following lines were drawn: which toward North and East should include and be boundaries for the p [illegible] of the property which should belong [ ] the family sewer: a.b. in direction South 40 degree to East; b.c. in direction East: 16 degree to North; c.d. in direction South: 6 degree to East. As it would have taken several days to survey and measure the whole property and make a chart over it and therafter divide the 78 acres, did I suggest

> to the 2 parties, that the drawn line a.b.c.d. should act as boundaryline toward the North and East. while the SEA was boundary toward South and West, regardless of the divided area was bigger and smaller than 78½ acres. Both parties agreed with this, as they both wish to have the affair settled, and inasmuch as the property was of minor value, it did not matter much if the area was a little more or a little less than the 78½ acres. In the points B. & C. and on 2 places between c & d was the boundary marked by stonepiles [grammatical, spelling and punctuation irregularities in the original.] Pl.'s Exhibit 15.

Anderson's survey did not measure the property itself.

family and comprising 1⅖ acres. Pl.'s Ex. 15.[6]

11. In 1894, the heirs of Eve Maria Sewer transferred by quitclaim deed to Martin Sewer, their one-fifth claim in Longbay No. 1.[7]

12. An intervening agreement, in 1898, further divided the portion of Longbay No. 1 owned by the George family, parcel 6e. Four George heirs signed a quitclaim deed conveying a section of the parcel, subsequently designated 6-0, to Alphonso Roberts. The deed was recorded at Book 3–H, Page 472, No. 139. The stated acreage conveyed was 3⅖ of parcel 6e's 6⅖ acres. Pl.'s Ex. 21. Other William Henry George heirs, including Martha George, Emanuel George and James Wellington George, held the remaining portion of Parcel 6e, totalling approximately three acres.[8]

13. Then, in 1913, the Sewer and George families, as well as other East End landowners, entered into the second significant agreement, recorded at Book 3–I, Page 11, No. 272–276, which further clarified the ownership of various parcels of land in the East End. Pl.'s Ex. 16, 173. The 1913 Agreement assigned the George family holdings, formerly described in the 1984 Agreement as parcel 6a, the designation "6". Similarly, the Agreement assigned the Sewer family holdings, formerly described as parcel 6b, the designation "7".

14. In addition, the 1913 Agreement characterized descriptions of acreage as mere approximations. The 1913 agreement stated that:

> It is true that the above mentioned [acres] are only given as guess and approximately as no measuring ever has been made, and the acreage thus spoken of can consequently be less—or more but the difference can not be so great, that we could

own [substantially more]. We could think it possible, that some of the land in the East End of St. Jan never has been entered in the Matricul, as the land was considered worthless and also now partly is considered of hartly any value....

> It is understood, that the acreage, mentioned above is only calculatory and approximately and may be found different, when any measuring should be made. There is however no misunderstanding amongst us with regard to the boundaries. [grammatical and spelling irregularities in original] Pl.'s Exs. 16, 173.

15. The 1913 agreement further described Longbay No. 1 as "6o" divided into five parcels. Accordingly, in 1913, Longbay No. 1—parcel "6o" consisted of 3⅖ acres owned by Alfonso Roberts, 1⅖ acres owned by Martin Sewers, 3 acres owned by Ann Marie George, James Wellington George and Mary Elizabeth Boynes. Pl.'s Exs. 16, 173.

The court will next set forth findings of facts that locate each parcel of property and identify ownership interests. The court considers nine parcels, 6-0, 6-0-1, 6-0-2, 6f, 6y, 6z, 10, 6p and 7a, respectively.

B. *Parcel "6o", now known as Parcel 6-0, a portion of Longbay No. 1*

### Location and Title

1. The heirs of Alphonso Roberts executed a deed conveying to Raymond and Barbara B. Dobbs that portion of Longbay No. 1 known as "6o" in 1953. Pl.'s Ex. 5, 191. The deed was recorded at Book 4–E, Page 506, No. 142. Pl.'s Ex. 5.

2. The deed identified the property as "6 0:6f" as well as "6o of Hansen Bay" and

---

6. The "Longbay No. 1" designation predated the Anderson line. This designation appears first on the Danish government's 1867 Land List as belonging to Antoinette George's "Ass." The abbreviation "Ass." may represent 'heirs' because the 1894 agreement subsequently revealed that the land belonged to Antoinette George's heirs. Pl.'s Exs. 15, 29.

7. To the north and east were the George family holdings of Longbay No. 1, to the south was the property held by Christian Hughes "viz. Longbay No. 2," and to the West was the sea. Pl.'s Ex.

20. The designation "Longbay No. 2" appears on a 1868 Land List. Pl.'s Ex. 29.

8. The Alphonso Roberts parcel was bounded by Sullivan family property to the North, by property of the remaining George heirs to the East, by property of Martin Sewer to the South, and by the sea to the West. The contents of a deed conveying Sullivan property to Rebert Evason (spelling in original) also locates the Roberts parcel south of the Sullivan property. Pl.'s Ex. 164.

indicated that the property was "3⅝ acres, more or less, being the property ∴ formerly owned by Alphonso Roberts" consistent with the 1913 agreement. Pl.'s Ex. 5.

3. Louis Harrigan, a surveyor, first surveyed this property in 1956. His map designated the Roberts property "parcel 6–0" measuring 7.25 acres. Pl.'s Ex. 124. Harrigan's survey measured the acreage of the Roberts parcel at almost twice the size as its recorded acreage, 3⅝ acres, at the time of the 1913 Agreement. According to the 1913 agreement, the entire parcel of Longbay No. 1, including Roberts parcel, was only 8 acres.

4. The Harrigan survey boundaries were referenced in the next conveyance of the former Roberts property from the Dobbs to Alliston and Flor De Lis B. Roddy in 1957. The warranty deed contained a metes and bounds legal description and was recorded at Book 4–N, Page 112, No. 874. Pl.'s Ex. 1.

5. Subsequently, title to the former Roberts property was transferred five times. Pl.'s Exs. 2, 3, 120, 4, and 10. In 1959, Alliston and Flor De Lis B. Roddy conveyed their interest in parcel 6–0 to William F. Callahan and Carmel Callahan by warranty deed recorded at Book 5–E, Page 285, No. 2108. Pl.'s Ex. 2. In 1962, William and Carmel Callahan conveyed their interest in parcel 6–0 to Harry Cameron, Grace Cameron, Robert Carney and Carol Carney by warranty deed recorded at Book 6–I, Page 164, No. 1333. Pl.'s Ex. 3. In 1967, Carol Carney conveyed her interest in 6–0 to Robert Carney by quitclaim deed recorded at Book 9–G, Page 134, No. 60. Pl.'s Ex. 120. In 1969, Robert Carney, Harry Cameron, and Grace Cameron conveyed parcel 6–0 to Newfound Corporation by warranty deed recorded at Book 10–M, Page 69, No. 5979. Pl.'s Ex. 4. Finally, in 1989, Newfound Corporation conveyed parcel 6–0 to Newfound Limited Partnership by warranty deed recorded at Book 35–X, Page 221, No. 2724. Pl.'s Ex. 10.

6. Each time the property was conveyed, except the final transfer, the deeds referenced the Harrigan survey. The last transfer, in 1989, was between plaintiff's predecessor-in-interest, Newfound Corporation, and Newfound Limited Partnership, of which plaintiff is the general partner. The 1989 transfer referenced a 1987 re-survey by surveyor Marvin Berning. Pl.'s Ex. 10. Marvin Berning had also completed a re-survey in 1969. Pl.'s Ex. 125.

7. Berning's 1987 survey, referenced in the final transfer between Newfound Corporation and Newfound Limited Partnership, measured Parcel 6–0 to be a total of 8.06 acres whereas the 1969 survey measured the parcel to be 8.0 acres. Pl.'s Exs. 125, 45.

8. When Berning surveyed the former Roberts property in 1969 he relied on testimonial and field evidence to identify Harrigan's lines. While researching property boundaries, Berning spoke to Amos Sullivan, an "old-timer" who had lived north of the Roberts property. Mr. Sullivan showed the approximate boundaries to Berning, noting that for over fifty years the entire Roberts parcel had been fenced. Although Berning took his measurements using the concrete boundposts placed at corners by Harrigan in 1956, Berning followed the ancient fenceline rather than Harrigan's straight lines. As a result, Berning's survey calculated the parcel's acreage at eight acres rather than Harrigan's 7.25. Pl.'s Ex. 125.

9. Plaintiff presented no well-articulated reason or evidence to explain why the 1969 and 1987 Berning surveys differed.

10. Parties stipulated that plaintiff holds record title to Parcel 6–0, Estate Hansen Bay A, No. 6 East End Quarter, St. John, U.S. Virgin Islands, as shown on the survey filed as P.W.D. No. D9–4311–T88. *Joint Pre–Trial Order* at 6 (June 14, 1994).

C. *Parcel 6–0–1, a portion of Longbay No. 1*

1. *Location*

a. The reader will recall that the 1894 agreement divided Longbay No. 1 into two parcels, 6e and 6f. Then the 1913 agreement further divided Longbay No. 1 into the Martin Sewer parcel (6f), the Alphonso Roberts parcel (now 6–0 from 6e) and three more acres held in common by Mary Elizabeth Boynes, Ann Maria George and James Wellington George (also of 6e). A 1915 Danish

land list records the owners and their respective Longbay No. 1 holdings as Martin Sewer (1⅙ acres), Alphonso Roberts (3⅘ acres), Mary Elizabeth Boynes (1 acre—now known as 6–0–1) and Ann Maria George and James Wellington George (2 acres held in common). Pl.'s Ex. 17.

b. Mary Elizabeth Boynes was the sole owner of her mother's, Martha George's, interest in the George land (6e). Pl.'s Ex. 22. Her brothers and sisters had conveyed their interest in the property to her in 1913. Pl.'s Ex. 22. Mary Elizabeth Boynes died in 1944, leaving three children, Vitalia Boynes, Florence Boynes, and Eldora Boynes who inherited their mother's interest in Longbay No. 1. Pl.'s Ex. 129.

c. Marvin Berning filed a survey of the property in 1971 which measured the total acreage at 3.58 acres. Pl.'s Ex. 171. At trial, Berning testified that he relied on evidence gathered from residents and field work to locate the parcel. Amos Sullivan, the resident to the north, showed him the western boundary of Boynes property in 1969. Berning also testified that the north and south bounds of the property were fenced. In addition, Berning relied on information he gathered from a field visit with Vitalia Boynes. She described the southeastern boundary of 6–0–1 as running "up the gut to the locust tree and from there up to the corner of Roberts' property" and the western boundary as bounded by Martin Sewer's parcel 6f. (T. 2, p. 149–50). Furthermore, a Sewer family member, Bernard Williams, showed Berning the location of the southeast corner. Pl.'s Ex. 171. After consulting with the Department of Public Works on St. Thomas, Berning renamed the Boynes parcel 6–0–1, a designation reflecting that it was historically part of Longbay No. 1 and adjacent to the former Roberts parcel now known as 6–0. (Tr. 2, p. 53–54). However, parcel 6–0–1 was never within parcel 6–0.

d. Berning's 1971 survey followed monuments—trees and fencelines—to plot the southern boundary line of parcel 6–0–1. Pl.'s Ex. 171. He set four boundposts as witness posts [9] to existing monuments on the ground. Subsequently, in 1974, another surveyor, Louis Harrigan, surveyed the property to the south, now known as 6p and retraced 6–0–1 southern boundary line (6p's northern boundary) from boundpost to boundpost rather than along Berning's 1971 survey line. As a result, Harrigan's line did not follow the original title line Berning memorialized in 1970. In 1987, at Newfound Corporation's request Berning revised the southern boundary of 6–0–1, to avoid a conflict with Harrigan's drawing of the same line. Pl.'s Ex. 46. In so doing, Newfound reduced the size of parcel 6–0–1 by .01 acre. Berning's re-survey in 1987 calculated the parcel's acreage at 3.57 acres. Pl.'s Ex. 46. At the time Newfound requested this change, Newfound was not sole owner of the property although the record does not adequately identify any other owner(s) at that time.

2. *Title*

a. On November 21, 1972, Vitalia and Florence Boynes [10] conveyed one-third of

9. A surveyor places a witness post, an artificial monument, to define a boundary in relation to another fixed object, such as a tree or a shoreline, to ensure a permanent reference point exists which marks a boundary. See BROWN, BOUNDARY CONTROL at 91.

10. Neither plaintiff nor defendants developed the record with respect to Eldora Boynes' interest in the property. She may have passed away prior to this conveyance for she was not listed as an heir of the estate of William D. and Martha George when the estate was probated in 1979. Since both of her sisters were listed as heirs, if she was alive she would have been listed as well. Pl.'s Ex. 132. However, assuming she did predecease her sisters the court can not determine whether she conveyed out her interest in the property. Unhappily, this kind of informational gap is all too common in land disputes on St. John. See, e.g. Lynda Lohr, *Native V.I. families losing land to time, taxes*, V.I. DAILY NEWS, January 24, 1995, at 1 (title problems are compounded because assets of earlier generations of landowners were not properly probated and land transfers within families were often not written down).

Because Vitalia and Florence Boynes subsequently conveyed their interests in the property to Newfound Corporation by warranty deed, the court will draw the inference that Vitalia and Florence would not have done so if Eldora Boynes was living and still possessed an undivided interest in the property. In the absence of any information to the contrary, the court finds Eldora's interest passed to Vitalia and Florence and that Vitalia and Florence Boynes held this parcel in common.

their interest in the property to Newfound Corporation by warranty deed recorded at Book 14–E, Page 219, No. 5157. Pl.'s Ex. 9.[11]

b. In 1989, Vitalia Boyne's daughter, Sonja Christian, who was her mother's and Florence Boynes's, sole heir, conveyed the remaining two-thirds of the ownership interests in 6–0–1 to Newfound Corporation as well as her ownership interest in another parcel designated 6–0–2. The quitclaim deed was recorded at Book 14–E, Page 219, No. 5157. Pl.'s Exs. 6, 7, 8. *See, infra,* Parcel 6–0–2. A few months later, Newfound Corporation in turn executed a limited warranty deed conveying its interest in 6–0–1 to plaintiff's partnership, Newfound Limited Partnership recorded at Book 37–B, Page 505, No. 80. Pl.'s Ex. 11. Both of these conveyances were made in accordance with the later 1987 Berning survey with the adjusted southern boundary. Pl.'s Ex. 46.

c. The parties stipulated that plaintiff holds record title to Parcel 6–0–1, Estate Hansen Bay A, No. 6 East End Quarter, St. John, U.S.V.I., as shown on the survey filed as P.W.D. No. D9–4313–T88. *Joint Pre-trial Order* at 6 (June 14, 1994).

D. *Parcel 6–0–2*

1. *Location*

a. In 1898, soon after the 1894 Agreement divided Longbay No. 1 into two parcels, 6e and 6f, the parcel 6e was further divided into the 3⅝ acres property owned by Alphonso Roberts and a three acre remainder. The 1913 Agreement reflects this division of property and records that Ann Maria George, Mary Elizabeth Boynes, and James Wellington George held the three acre remainder jointly. Pl.'s Exs. 21, 135.

b. By 1915 the three acre remainder had been partitioned with Mary Elizabeth Boynes holding one acre and Ann Maria George and James Wellington George holding the additional two acres in common. Pl.'s Ex. 17. *See also* Parcel 6–0–1, *supra.* Then in 1921, after her husband Emanuel Nelson George's death, Ann Marie George conveyed her one acre interest in 6e to Mary Elizabeth Boynes. Pl.'s Exs. 12, 135. According to plaintiff, this deed was misplaced and not recorded until 1982. Thus, after these two conveyances, Mary Elizabeth Boynes held two acres of the three acre remainder of 6e.

c. The 1921 deed conveying Ann Marie George's property to Mary Elizabeth Boynes describes the one acre parcel of 6e as contiguous with Mary Elizabeth Boynes' parcel located to the West.

d. At Newfound Corporation's request, Marvin Berning surveyed the Ann Marie George parcel in 1988, identifying its boundaries and calculating its acreage at 2.28 acres. *See* Pl.'s Ex. 47. Berning named the parcel 6–0–2 with the approval of the Office of Public Works and recorded the survey as P.W.D. D9–4848–T89. (Tr. 2, p. 59). Berning selected the name 6–0–2 to reflect the parcel's historical location within Longbay No. 1. The land now known as parcel 6–0–2 was never located within the bounds of 6–0 or 6–0–1.

e. Berning relied on a number of facts to locate 6–0–2. As noted in the 1921 deed, Mary Elizabeth Boynes purchased a contiguous parcel from Ann Marie George. Because the property was bounded by other identified parcels to the North, West and South, Berning deduced that the Ann George property had to lie East of the first Mary Boynes

It troubles the court that information concerning title to St. John properties is glaringly incomplete and sometimes indecipherable. The court encourages property holders to document their claims fully. In some cases landowners may need to recreate genealogical histories based on birth and death records to substantiate and demonstrate that family property has passed by operation of law to identified family members.

11. In 1972, Newfound Corporation also obtained warranty deeds from other persons asserting

property interests in parcel 6–0–1. Specifically, Maude and Moses Harley, Anton George, for himself and as attorney in fact for Earl Christian and Mercedes Ferrer under Powers of Attorney, and Beulah Battiste transferred any interest they had in 6–0–1 to Newfound Corporation. Pl.'s Exs. 48, 49. The question of whether or not any of these parties actually possessed ownership interests to convey to Newfound Corporation is not before the Court.

parcel. Indeed, 6–0–2 as surveyed is adjacent and to the West of 6–0–1.

f. In performing his survey, Berning relied on statements from at least two persons to locate and set perimeters for parcel 6–0–2. Berning relied on information he learned from a site visit with Amos Sullivan to locate the shared 6–0–1/6–0–2 boundary. During a visit in 1969, Mr. Sullivan identified the eastern boundary of 6–0–1 to locate the shared boundary. *See* parcel 6–0–1 *supra.* Berning also visited the site with Harry Emanuel Sewer, the grandson of Martin Sewer, who indicated that Mary Elizabeth Boynes lived on the hill above the locust tree depicted on plaintiff's exhibit 199. (Tr. 2, p. 55). According to Berning's testimony, Sewer reported that the Boynes property shared a common boundary with him when his family owned 6Y and that as a young boy, he and Mary Elizabeth Boynes used to talk to each other over the fence. (Tr. 3, p. 42). Thus, Sewer's statements substantiated Berning's conclusion that 6–0–2 was bounded on the North and East by a trail along the ridgeline that had been fenced. (Tr. 3, p. 37–8).

g. To determine the southern boundary of 6–0–2, Berning relied on a 1982 survey by Louis Harrigan of a parcel Harrigan labelled "10" and filed as P.W.D. No. D9–2468–T83. Pl.'s Exs. 26, 47. *See* parcel 10, *infra.*

2. *Title*

a. In 1913, Ann Marie George held an ownership interest as a tenant in common in the three acre remainder of parcel 6e. The 1913 Agreement documents her ownership interest. Pl.'s Ex. 16, 173.

b. In 1921, Ann Marie George conveyed a one acre parcel, her interest in the three acre remainder, to Mary Elizabeth Boynes. This deed was misplaced and not recorded until 1982 at Book 23–V, Page 91, No. 2984. Pl.'s Ex. 12.

c. When Sonja S. Christian inherited her mother and aunt's estates (Vitalia and Florence Boynes) pursuant to court order, she inherited their mother's (Mary Elizabeth Boynes) title to parcel 6–0–2 pursuant to territorial court order. Pl.'s Exs. 6, 7.

d. In 1989, Sonja S. Christian conveyed parcel 6–0–2 to Newfound Corporation by quitclaim deed recorded in Book 34–M, Page 125, No. 3997. Pl.'s Ex. 8. Shortly after this transfer, Newfound Corporation conveyed its interest to plaintiff's partner, Newfound Limited Partnership, by limited warranty deed recorded at Book 37–B, Page 505, No. 80. Pl.'s Ex. 11.

e. Parties have stipulated that plaintiff holds record title to parcel 6–0–2, Estate Hansen Bay A, No. 6 East End Quarter, St. John, U.S.V.I., as shown on the survey filed as P.W.D. No. D9–4848–T89. *Joint Pre-Trial Order* at 6 (June 14, 1994).

E. *Parcel 6f* [12]

1. *Location*

a. The 1894 Agreement divided Longbay No. 1 into two parcels 6e comprising 6⅘ acres and 6f comprising 1⅕ acres. Pl.'s Ex. 15. *See* Findings of Facts, Historical Background, *supra.* One month after this agreement, the heirs of Eve Maria Sewer conveyed parcel 6f to Martin Sewer by warranty deed. Pl.'s Ex. 20. The deed explicitly referenced the George and Sewer families' agreement identifying the parcel sold as a portion of Longbay No. 1.

b. Martin Sewer's deed described the legal boundaries of 6f as follows: "North and East boundary. The south boundary of Longbay no. 1. West. The bay. South. The boundary of Christian Hugh. Viz: Longbay No. 2." As the description indicated, parcel 6e (the remainder of Longbay No. 1) bounded 6f to the north and east. This description is consistent with plaintiff's depiction of the various properties and their

---

**12.** The designation "6f" used here refers to the 1⅕ acre section of Longbay No. 1 Martin Sewer purchased, not the Maria A. and Zelma L. Robert parcel also known as "6f" that is listed on the 1913 Agreement. Pl.'s Exs. 16, 173. The historical documents support the continued existence and subsequent conveyance of the Martin Sewer parcel referred to as 6f in the 1894 Agreement. Berning testified that he named the Martin Sewer property "6f" to reflect the 1894 Agreement's nomenclature. (Tr. 2, p. 61) Plaintiff's exhibit 199, the composite map attached to this opinion as Appendix A, depicts Martin Sewer's former property as "6f".

relationship to each other on the composite map (Appendix A). The composite map shows that the parcels components that constitute 6e, namely 6–0, 6–0–1, 6–0–2, and an unknown remainder, are north and east of 6f with Christian Hughes' former property 6p to the south.

c. Berning performed his original survey of parcel 6f in 1970, calculating the acreage at 1.36 acres, and recorded his survey as P.W.D. No. G9–1668–T70. Pl.'s Ex. 172. When Berning first surveyed parcel 6f, Amos Sullivan was present and pointed out the entire boundary of the property. Berning testified that Sullivan "knew exactly where it was." (T. 3, p. 60) Sullivan indicated that the western boundary was the bay, the northern and southern boundaries were fenced and located two tamarind trees marking the eastern boundary.

d. Sullivan's identification of parcel 6f's boundaries was consistent with historical documentation, including the Roberts deed which described parcel 6f as contiguous and south of the Roberts parcel (now known as 6–0). In addition, Berning's survey measured the acreage of parcel 6f, concluding that the acreage of the surveyed property was close to the stated acreage of parcel 6f recorded in the 1894 Agreement. (T. 2, p. 61). Since the stated acreage was so close, Berning surmised that when Anderson surveyed Longbay No. 1 in 1893 and divided it into parcels 6e and 6f, Anderson cut out and measured 6f, the Martin Sewer piece, rather than surveying the much larger parcel 6e. (Tr. 2, p. 46). Although the court generally has regarded acreage as an identifying tool with caution, in the context of Anderson's action regarding this parcel, the court adopts Berning's conclusion.

e. In 1974, after Berning filed his original survey, Louis Harrigan, surveyed an adjacent parcel, 6P, directly south of 6f, including a survey of their common boundary. Pl.'s Ex. 160; See, parcel 6–0–1, supra. According to Berning's testimony and notes on his survey map, Harrigan's survey measured the northern boundary of 6P (the southern boundary of 6f) from boundpost to boundpost rather than along a fenceline as Berning's survey of 6f had indicated. Pl.'s Ex. 46; Tr.

3, p. 62. This difference resulted in a net increase in parcel 6f's acreage of .01 acre. Def'ts' Exs. D1–O, D1–P. After conferring with Newfound, Berning conformed his survey to reflect Harrigan's survey of the common boundary. In 1987, Berning performed a re-survey of 6f, measured at 1.37 acres and filed the survey as P.W.D. No. D9–4313–T88. Pl.'s Ex. 46. The re-survey memorialized Harrigan's redrawing of the common boundary of 6f and 6p. When Newfound gave Berning permission as a landowner to alter his original 1970 survey's southern boundary to accommodate the Harrigan survey, Newfound was not the sole owner of 6f.

2. *Title*

a. In 1894, Martin Sewer purchased 6f, a 1⅛ acre portion of Longbay No. 1, from heirs of Eve Maria Sewer including William H. Sewer, Peter C. Sewer, Catherine M. Sewer Beverhoudt, and William "McBean" (probably McClean not McBean). This warranty deed was recorded at Book 3–H, page 471, no. 138. Pl.'s Exs. 15, 20.

b. The 1913 Agreement lists Martin Sewer as the owner of a 1⅛ acre parcel of Longbay No. 1. Pl.'s Exs. 16, 172. The Agreement is recorded at Book 3–I, Page 6, No. 275–276. Adelaide Williams, Martin Sewer's sister, signed the 1913 Agreement acknowledging that Longbay No. 1 had been divided and Martin Sewer's title to parcel 6f. Pl.'s Ex. 16.

c. At trial, Newfound submitted family genealogies in chart form to reflect conveyances by Martin Sewer's heirs to Newfound. Pl.'s Ex. 194. The charts suggest that Martin Sewer had five children who would have been distributees upon his death. The five children were Samuel Sewer, Conrad Sewer, Mortimer Sewer, Ruth Sewer Roberts and Daisy Sewer Stevens. Defendants did not offer any evidence to rebut these genealogical charts or challenge Newfound's conclusion that Martin Sewer's estate descended by operation of law to his issue alone. Indeed, Sewer stated at his deposition that Martin Sewer's interest in the land passed "through heritage" to a "whole host of [heirs]." Pl.'s Ex. 152 (Irvin Sewer's Dep. at 11 (September 24, 1991)).

d. Martin Sewer's son Samuel Sewer had at least eleven children: Samuel Sewer, Jr., Antonio Sewer, Olive Sewer, Lucia Sewer Jones, Geraldine Hassel, Lionel Sewer, Merrill Sewer, Cresida Sewer, Rufina Sewer, Philip Sewer, and Dyett Sewer. Of these children or their issue, only two, Merrill Sewer and Philip Sewer, did not convey their interests, if any, in parcel 6f to Newfound Corporation. Pl.'s Exs. 85, 87, 90, 91, 93, 95, 100, 163, and 168. The other children executed quitclaim deeds in favor of Newfound Corporation which were recorded.

e. Martin Sewer's son Conrad Sewer had at least ten children: Randolph Sewer, Alphonso Sewer, Felix Sewer, Blanche Frazer, Roy Sewer, George Sewer, Chrissie Sewer, Agnes Sewer, Albina Sewer, and Evaline Sewer. Of these children or their issue, five, Felix Sewer, Blanche Frazer, Roy Sewer, Albina Sewer, and Evaline Sewer, did not convey their interests, if any, in parcel 6f to Newfound Corporation. Of the five who may have retained an interest in parcel 6f, one of them, Felix Sewer, deeded his interest to defendant Irvin Sewer and defendant Violet Sewer Mahabir. Irvin and Violet Sewer recorded their interest. Pl.'s Ex. 169. The other five children signed quitclaim deeds in favor of Newfound Corporation. Pl.'s Exs. 88, 96, 97, 98, and 99. These conveyances were recorded.

f. Martin Sewer's son, Mortimer Sewer, had at least one child, Emanuel "Harry" Sewer who signed a quitclaim deed in favor of Newfound Corporation. Pl.'s Ex. 94. The conveyance was recorded.

g. Martin Sewer's daughter Ruth Sewer Roberts had at least three children, Desmond Roberts, Cecil Roberts, and Grace Roberts. Each of them, or their issue, conveyed his or her interest, if any, in parcel 6f to Newfound Corporation by quitclaim deeds which were recorded. Pl.'s Exs. 83, 86 and 89.

h. Martin Sewer's daughter Daisy Sewer Stevens had at least three children, Stanley Stevens, Gladstone Stevens and Archibald Stevens. Gladstone and Archibald Stevens conveyed their interests, if any, in parcel 6f to Newfound Corporation by quitclaim deeds. Pl.'s Exs. 84, 92. These deeds were recorded. Newfound has represented that Stanley

Stevens died childless, and, in the absence of contrary evidence, the court concludes that any interest he may have possessed would have passed to his brothers or parents.

F. *Parcel 6y*

1. *Location*

a. In 1912, members of the George family engaged two surveyors, J.E. Lindquist and G. Bornn, to measure a thirty-acre parcel of George land to benefit one of William Henry George heirs, Henrietta George Sewer. Pl.'s Ex. 69, 195. The surveyors described the parcel and its boundaries in detail. Its boundaries included the shoreline of Privateer Bay and a cliff to the east, a plot of land belonging to Martin Boynes, George land and a pond to the north, a tamarind tree at the summit overlooking Long Bay, marked by a boundpost, at its northwest corner, the eastern boundary fence of Richard Stevens land to the west, a boundpost at the southwest corner, and, finally, a line "proceeding in an easterly direction down a small ravine to a spot on Stony Bay". Pl.'s Ex. 69. Lindquist and Bornn's survey was recorded in 1913.

b. Henrietta George Sewer immediately transferred the parcel to Richard Benjamin Stevens, whose name appears in the 1913 Agreement as owner of parcel "6y," a parcel of "Nr. 6" (the George family property), totalling 30 acres. Pl.'s Exs. 70, 16, 173.

c. Marvin Berning testified that Virgin Islands Engineering and Surveying completed the re-survey of 6y in 1974, P.W.D. B9–425–T74, after he no longer worked for the company. He also testified that he reread the deeds, the description of the original Lindquist and Bornn survey, compared acreage, and analyzed the boundaries in light of his knowledge of adjacent properties. Berning concluded that parcel 6y's boundaries, as surveyed in 1974, were correct. (Tr. 2, p. 63).

d. In addition, two old-timers confirmed the location of 6y in their conversations with Berning.

During his testimony, Berning stated that Anton George, whose family had been partial owners of 6y at one time, actually showed

him a portion of the northern boundary of 6y west of 6z, *see* parcel 6z, *infra*, that was fenced. George located the fenced boundary in the same place where the 1974 re-survey of record depicted it. (Tr. 2, p. 64). On another occasion, Berning went on a site visit with Harry Sewer. During the site visit, Berning reported that Sewer located Mary Elizabeth Boynes' property, known as 6-0-2, at the summit of the hill. Berning asserted that Sewer said her property was adjacent to Sewer's "old property." Berning understood Sewer's reference to mean that Boynes' property bordered on parcel 6y, property in which Sewer had an interest at one time. (Tr. 2, p. 55).

### 2. *Title*

a. In 1912, Henrietta Sewer conveyed parcel 6y to Richard Benjamin Stevens by warranty deed recorded at Book 3–H, Page 453, no. 115. Pl.'s Ex. 70.

b. Upon his death in 1927, Stevens devised parcel 6y to three children, conveying twenty acres to his daughter Christina (also known as Christiancia), and five acres each to son Joshua and daughter Consuela. Pl.'s Ex. 54.

c. In the 1980s, after Christina and Joshua's deaths, their heirs petitioned the court to determine ownership interests in the undivided property. Christina's interest passed to her son, Harry Sewer and to her daughter's estate, the estate of Lillian Powell, in equal parts as tenants in common. Lillian Powell's estate also was resolved by a petition for disposition in favor of her husband, Thadeus Powell and brother, Emmanuel, who shared her interest equally in parcel 6y as tenants in common. Pl.'s Ex. 56. Thus, Thadeus Powell had an undivided one-quarter interest in the Christina Stevens estate and Harry Sewer had an undivided three-quarters interest in her estate. Similarly, Joshua Stevens' heirs, Viola Smith, Godwin Stevens, Louisa Duzant and Mathilda Marsh took one-quarter interests as tenants in common. Pl.'s Ex. 55.

#### (i) *Through Christina Stevens*

(a) Harry Sewer conveyed by warranty deed his interest in the Christina Stevens' estate in 6y to Newfound Corporation recorded at Book 32–E, Page 326, No. 2179. Pl.'s Ex. 72.

(b) Harry Sewer and Thadeus Powell conveyed by warranty deeds their respective interests in Lillian Powell's estate to another entity, Gulf Caribbean Development Corporation. Pl.'s Ex. 71, 73. The deeds were recorded at Book 37–Z, Page 33, No. 3809 and Book 32–E, Page 323, No. 2178, respectively. The court notes that Thadeus Powell's stated interest in the property as noted on the deed appears incorrect in light of the territorial court's disposition of Lillian Powell's estate. Pl.'s Ex. 56. According to court documents Powell's interest before the conveyance was only an undivided quarter interest in Christina Stevens' estate not a ⅝th interest as described on the conveyance. Pl.'s Ex. 73.

(c) In turn, Gulf Caribbean Development Corporation conveyed by limited warranty deed its interests in parcel 6y through Harry Sewer and Thadeus Powell to Newfound Corporation and recorded the deed at Book 32–G, Page 381, No. 2188 in 1987. Pl.'s Ex. 78.

#### (ii) *Through Joshua Stevens*

Each of the Joshua Stevens heirs, Viola Stevens Smith, Godwin Stevens, Louisa Duzant and Mathilda Marsh, conveyed his or her interest in parcel 6y by warranty deed to Newfound Corporation. The deeds were recorded at Book 32–E, Page 11, No. 2174, Book 32–E, Page 320, No. 2177, Book 32–E, Page 317, No. 2176, and Book 32–E, page 314, No. 2175, respectively. Pl.'s Ex. 57, 58, 59, 60.

#### (iii) *Through Consuela Stevens Francis*

(a) Richard Stevens' third beneficiary, his daughter Consuela Stevens Francis ("Consuela"), held the remaining undivided interest in parcel 6y at the time the Territorial Court of the Virgin Islands declared her incompetent in 1980 and appointed her daughter, Enid Francis, guardian ad litem. Pl.'s Ex. 190.

(b) In Enid Francis' petition for the appointment of a guardian, Francis alleged that

Consuela had been mentally and physically incapable of conducting her own affairs for two years but also asserted that Consuela had contracted to sell her undivided interest in parcel 6y to Newfound Corporation for $30,000.00 and 120 shares of Newfound Corporation stock. At the time of the petition, Newfound had paid Consuela $4,000.00 of the purchase price. Pl.'s Ex. 190. Consuela's children consented to the petition with the exception of one son whose whereabouts were unknown. Pl.'s Ex. 190.

(c) After Enid Francis' appointment as Consuela's guardian on November 10, 1980, she signed a warranty deed, conveying Consuela's interest in parcel 6y to Gulf Carribean Development Corporation on November 23, 1981. This deed was recorded at Book 32–E, Page 329, No. 2180. Pl.'s Ex. 61.[13]

(d) Gulf Caribbean Development Corporation then conveyed by limited warranty deed its interests in parcel 6y through Consuela Stevens Francis to Newfound Corporation. The deed was recorded at Book 32–G, Page 381, No. 2188. Pl.'s Ex. 78.

(e) Finally, in 1989, Newfound Corporation conveyed parcel 6y by limited warranty deed to plaintiff's partner, Newfound Limited Partnership Management. The deed was recorded at Book 37–B, Page 505, No. 80. Pl.'s Ex. 11.

(f) In the joint final pre-trial order the parties stipulated that plaintiff holds record title to parcel 6y. *See* Joint Final Pre-trial Order at 6 § 6(e) (June 14, 1994).

**13.** At the time of trial, the guardianship had not been terminated.

**14.** The original translated deed bears the signature of Ludv. Anderson, the same surveyor who surveyed the George–Sewer line, *see* Findings of Facts, Historical Background, *supra*, as the recorder of the deed. The deed, however, does not state that Anderson actually completed a survey. Since Anderson recorded the deed in 1899, the deed's description may actually be based on a survey Anderson performed. If this is true then the 1969 survey is a resurvey, not an original survey. Within the context of this particular parcel the distinction does not affect the property bounds but is worth noting.

**15.** The Stevens property to the south of 6z, known as 6y, was undivided and numerous landowners held the property as tenants in common.

## G. *Parcel 6z*

### 1. *Location*

a. In 1879, Isabella Electra Sewer sold a parcel of land to Martin Henry Boynes described as

> a small lot of land situated in the east end quarter named Privateerbay bounding to the East by the pond, to the south by extrimity of the pond on a direct line; West to a large Rock and from that direct North to a large Rock in the gut and from that Rock west in the gut a direct course East bounding with Mr. Henry George on the ridge [irregularities in the original].

Pl.'s Ex. 128. The deed was recorded at Book U, Page 279, No. 31 in 1899. Pl.'s Ex. 128.

b. Both the subsequent 1912 and 1915 land lists and the 1913 Agreement confirm Boynes' purchase of the land, designating the parcel "6z" and approximating its acreage at 10 acres. Pl.'s Exs. 16, 17, 31, 173.

c. Marvin Berning testified that, in 1969, his associate conducted an original survey[14] of parcel 6z's boundaries in the company of representatives of the adjacent landowners.[15] (Tr. 2, 62–63). Once the surveyor prepared the survey map, three family representatives signed the survey map approving of the boundaries as drawn. The survey map was filed as P.W.D. No. B9–243–T69. An examination of the survey map reveals that Ivan George "for [the] heirs of George family," approved the northern boundary, Antonio George "for [the] heirs of George family"

This pattern of ownership—many heirs having an undivided interest in a parcel of land—was typical for property on the East End of St. John.

Presumably, owners of neighboring parcels to the west, north and east of parcel 6z, pieces of property not at issue in the present case, may have also held the property as tenants in common. This premise is borne out by the signatures on each boundary where signatories signed as representatives of a number of family members. As a result, while each of the survey plan's boundaries was only approved by one person, the court finds that each signatory acted in a representative capacity when approving the boundary. The court is unaware of any evidence suggesting that these signatories were not acting as representatives or out of mere self-interest.

approved the eastern boundary, Joshua Stevens "for [the] heirs of Richard B. Stevens" approved the southern boundary, and lastly, Loredon Boynes, "for [the] heirs of Martin Henry Boynes" affirmed the perimeter of parcel 6z. The parcel's approximate acreage as surveyed was 17.85 acres. Pl.'s Ex. 65.

d. Berning also testified that he recently resurveyed 6z to further subdivide the parcel. (Tr. 2, p. 62). In so doing, he confirmed the accuracy of the prior survey. He stated that while the description in the deed transferring the property from Isabella Sewer to Martin Boynes was rather limited, he accepted the 1969 survey perimeter because the landowners agreed upon the boundaries. (Tr. 2, p. 63–64).

### 2. *Title*

a. In 1969, Martin Boynes' heirs, Loredon Boynes, Florence M. Boynes, Vitalia Boynes, James A. Boynes, Anton E. Boynes, Eldora Boynes, Miles H. Gumbs, and Thadeus W. Gumbs, conveyed their interests by warranty deed to Leo Barbel, Miguel Fuertes, Aubrey Nelthropp, and George C. Parrott in 1969. The conveyance was recorded at Book 11–C, Page 58, No. 1310. Pl.'s Exs. 63, 129.

b. Leo Barbel, Miguel Fuertes, Aubrey Nelthropp and George C. Parrott conveyed their interests in parcel 6z by warranty deed to Newfound Corporation recorded at Book 14–R, Page 2667, No. 2965. Pl.'s Ex. 64.

c. Finally, in 1989, Newfound Corporation conveyed its interest in parcel 6z by limited warranty deed to plaintiff's partner, Newfound Limited Partnership who recorded its interest at Book 37–B, Page 505, No. 80. Pl.'s Ex. 11.

d. In the joint final pre-trial order the parties stipulated that plaintiff holds record title to parcel 6z. *See Joint Final Pre-trial Order* at 6 § 6(f) (June 14, 1994).

### H. *Parcel 10*

#### Location and Title

1. The designation "parcel 10" refers to a survey prepared by C.A. Hamilton & Associates in 1982 and filed as P.W.D. No. D9–2468–T83. The George family retained C.A. Hamilton & Associates to survey a portion of Longbay No. 1, the James Wellington George's property. Pl.'s Exs. 26, 40. (Tr. 2, p. 168). The survey calculated the acreage of the parcel at 1.975 acres.

2. According to the 1913 Agreement, James Wellington George held an undivided interest in the portion of Longbay No. 1 with Ann Marie George and Mary Elizabeth Boynes as tenants in common. Pl.'s Exs. 15, 16 & 173. The stated acreage of the parcel was three acres.

3. Subsequently the property was partitioned. Mary Elizabeth Boynes had acquired two of the three acres between 1913 and 1921. Pl.'s Ex. 12. Thus, documentary evidence shows that after the partition, James Wellington George was the owner of a one-acre parcel. Pl.'s Ex. 12, 16, 17, 21, 135.

4. The entire perimeter of parcels 6–0, 6–0–1, 6–0–2, and 10 was fenced except for the eastern boundary which follows an old trail on the ridge. Pl.'s Ex. 26. This physical evidence may suggest that the fenced property was the parcel known as 6e in the 1894 Agreement. Pl.'s Ex. 15, 26. (Tr. 2, p. 157–58; Tr. 3, p. 36, 44–45).

### I. *Parcel 6P*

#### Location and Title

1. As early as 1867, Longbay No. 2 appears as a distinct piece of property on Danish land lists. Christian Hughes, born 1791, held record title to the property measured at four acres. Pl.'s Ex. 29, 32. Longbay No. 2 is also known as 6p, reflecting the 1894 Agreement's division of the East End and the parcel's designation on the 1913 Agreement. Pl's Exs. 31, 16, 173.

2. Martin Sewer's deed for parcel 6f identifies the location of 6p. The property of Christian Hughes, known as Longbay No. 2, was located south of Longbay No. 1, sharing a common boundary with Martin Sewer's 6f, a portion of Longbay No. 1. Pl.'s Ex. 20.

3. Pursuant to the 1913 Agreement all parcels designated by a six were located north of the George–Sewer line and parcels designated by a seven were south of the line.

Pl.'s Ex. 16. Therefore, parcel 6p must have been located north of the George–Sewer line.

4. This court entered a consent judgment in a related case, *Eric Christian, Sr., as Administrator of the Estates of James George Sewer,* Prob. No. 398–1980, on June 2, 1994. The terms of the consent judgment awarded title to defendants Cedric Lewis, the representative of the Estate of Bernard Williams, and defendant Irvin Sewer, for the heirs of Martin Sewer. Since the location of the parcel is in question, the court instructed the defendants to arrange for the parcel to be surveyed. To the court's knowledge, no surveyor has been engaged thus far to perform the survey.

## J. *Parcel 7a*

### 1. *Location*

a. The 1894 Agreement designated the land south of the George–Sewer line as Sewer family land, consisting of 78½ acres. Pl.'s Ex. 15. As a result of the second Agreement in 1913, land south of the George–Sewer line received a new designation "7". Pl.'s Ex. 16. The Agreement further divided parcel 7 into four sections, 7a (24¾ acres), 7b (14½ acres), 7c (4¾ acres), and 7d (34½ acres). Parcel 7a is listed as belonging to the "Sewer family." *Id.* The north boundary of the parcel was the George–Sewer line. Since parcel 7a was merely the remainder of the Sewer property and it was not conveyed to others, no deed sets forth a description of the property.

b. This parcel of land has not been surveyed. The court's order of June 2, 1994 in *Eric Christian, Sr., as Administrator of the Estates of James George Sewer,* Prob. No. 398/1980, provides for the owners of the parcel to engage a surveyor. Unfortunately, to the court's knowledge, the owners of the parcel have not engaged a surveyor to perform the required perimeter survey.

c. To seek to locate the bounds of parcel 7a the court must turn to conveyances documenting the transfer of property adjacent to the parcel and other documentary and testimonial evidence. Of these adjacent parcels, parcel 7b, known as "Water Rock" lay to the west of 7a. The eastern boundary of parcel 7a according to old-timer Harry Sewer's testimony as reported by Berning, consisted of a number of boundaries with different parcels. To the northeast lay parcel 7c owned by Martin Sewer. Immediately adjacent and to the south of 7c lay parcel 6m [16], a parcel known to Harry Sewer as the "Well Parcel," that adjoined the Salt Pond. Further south to the east lay Salt Pond. According to Harry Sewer's reported statements, the pond was historically split in two, with the western portion belonging to parcel 7a and the eastern portion belonging to parcel 7d, Richard Steven's property (Tr. 2, p. 69–71); Pl.'s Ex. 16. Finally parcel 7a was bounded to the north by the George–Sewer line and the sea provided a likely natural boundary to the south. *See generally* Appendix A.

d. The best evidence of parcel 7a's boundaries presently before the court comes from the original deed identifying parcel 7b (parcel 7a's western boundary) and the testimony of Harry Sewer, that supports Berning's interpretation of the western bound and verifies field evidence Berning identified as the eastern bound. Pl.'s Ex. 36; (Tr. 2, p. 69–71).

e. Beginning with parcel 7a's western boundary, the 1902 original deed identified parcel 7b calling it "Water Rock" and measured it at 10 acres.[17] Pl.'s Ex. 36. No further description appears on the deed. During his field visit with Berning, Harry Sewer defined Water Rock as the isthmus south of point B of the George–Sewer line, extending to the west from the ridgeline. (Tr. 2, p. 70). Subsequently, in September 1994, Berning searched the site described by

---

**16.** The court takes the designation parcel 6m from the 1913 Agreement that locates 6m at Salt Pond. Berning's composite map and testimony refer to this parcel as part of the "Well Parcel" known as 7c. (Tr. 2, p. 69–70); *see* Appendix A. The location of 6m and 7c are not properly before the court at this time. In choosing how to refer to certain unlocated parcels, the court

chose to use both designations, 6m and 7c in order to simplify its discussion of parcel 7a's eastern boundary.

**17.** The 1913 Agreement listed the property as consisting of 14½ acres. Pl.'s Ex. 16.

Sewer. He testified that he found old barbless and barbed fence lines extending south from point B and to the southwest along the ridge pointed out by Sewer. (Tr. 2, p. 70–71).

f. The court finds that the combination of the natural topography, Sewer's statements and the presence of fence remnants, particularly unbarbed wire fence, is persuasive evidence on which a surveyor could validly rely to set parcel 7a's western boundary.

g. Complicating matters, there exist two surveys of portions of 7b, that extended the western boundary of 7b over the ridgeline into the area probably belonging to parcel 7a. Floyd George surveyed portions of parcel 7b he named parcels No. 1 and 3. He completed and filed maps of both portions in 1965. Pl.'s Ex. 177, 179.

h. As a result of the subsequent conveyances that referenced Floyd George's surveys, the court finds a portion of parcel 7b totaling, according to Berning's calculations, 3.9 acres [18] was conveyed out of parcel 7a. *See* Appendix A; *see also* Pl.'s Ex. 198 (exhibits). Berning's composite sketch of parcel 7a's bounds set the total acreage at 17.9 acres.[19] That part of parcel 7a appears to have been conveyed out, through property transfers relating to parcel 7b, has certain implications to be addressed in the following title section.

i. Turning to the eastern boundary, the only proofs presented to the court are Harry Sewer's statements that corroborate Berning's placement of 7c to the east of parcel 7a. During his field investigation, Berning located fencelines along the southern and western boundary of the "Well Parcel" or parcel 6m and along the western boundary of parcel 7c north to the George–Sewer line. See Appendix A. Sewer verified that Berning had properly located parcel 7c. (Tr. 2, p. 69).

j. Since the record does not contain deeds relating to parcel 7c or 7d, both of which might help locate the eastern boundary of

parcel 7b, the court cannot make a further finding with regard to parcel 7a's likely eastern boundary to assist a future surveyor.

2. *Title*

a. This court's June 2nd order in the *Eric Christian* action awards title to parcel 7a to defendants Cedric Lewis, as representative of the Bernard Williams estate, defendant Irvin Sewer, and Newfound as tenants in common. The court's order does not mention explicitly Violet Mahabir Sewer's interest in the property. Nevertheless, since defendants' interest in this parcel descended through Martin Sewer and Adelaide Williams, as brother and sister, and both Irvin and Violet Sewer hold an interest through a Martin Sewer heir, Felix Roberts, the court will, *sua sponte*, recognize Violet Sewer's interest in the property. The court notes that plaintiff concedes certain ownership interests of Cedric Lewis, Irvin Sewer and Violet Sewer. See Pl.'s Ex. 198 (argument).

b. The percentages of ownership are at issue and must be determined. Ownership of parcel 7a vested in Martin Sewer and Adelaide Williams in equal shares. *See generally* Pl.'s Ex. 15. The estate of Bernard Williams asserts title claims through Adelaide Williams while Newfound and Irvin and Violet Sewer assert their interests through Martin Sewer.

(i) *Through Adelaide Williams*

(a) Adelaide Williams and her successors-in-interest conveyed half of her interest in parcel 7b, known as Water Rock, through a series of recorded deeds. See Pl.'s Exs. 142, 165, 166 and 175 (parcel No. 1) and Pl.'s Exs. 133, 141, 144, 177 (parcel No. 3). The bounds specified in the deeds transferred portions of parcel 7a in addition to a parcel 7b. Pl.'s Exs. 175, 176.

---

**18.** The court understands this calculation to be an approximation. Upon the filing of the survey map of parcel 7a, this figure, since it bears on ownership interests of the defendants, shall be compared and verified.

**19.** The court is not troubled by the fact that the contemporary acreage of parcel 7a amounts to less than the estimated acreage listed in the 1913 Agreement. Even the parties to that agreement were uncertain as to what property constituted parcel 7a. Pl.'s Ex. 16.

(b) The court finds that Adelaide Williams successors-in-interest's conveyances caused a de facto partition of parcel 7a along Floyd George's parcel 3's eastern boundary. Pl.'s Ex. 177. As a result of these conveyances involving parcel No. 1 and No. 3, the court finds that successors-in-interest of Adelaide Williams have conveyed to third parties 21.7877% (3.9 acres of 17.9 total acres) of Adelaide Williams' ownership interests in parcel 7a. As a result, the estate of Bernard Williams' ownership interest in the remaining total acreage of parcel 7a equals 28.2123% (50%—21.7877%).

(c) Since the estate of Bernard Williams' interest is diminished, Newfound and the Sewers will share, in equal parts, the residual percentage of the Adelaide Williams interests. (21.7877/2 = 10.8938%)

(ii) *Through Martin Sewer*

(a) As the court set forth above, *see generally* Findings of Facts, Part E(2), *supra,* plaintiff documented and recorded [20] its ownership interests in parcel 7a through a series of conveyances. Pl.'s Exs. 101–118, 44, 74. Accordingly, plaintiff holds 86.36363% of the identified interests in the Martin Sewer estate.

(b) Defendants Irvin and Violet Sewer hold 2.0% of the identified ownership interests in the Martin Sewer estate through Felix Sewer, Martin Sewer's grandson. *See* Findings of Facts, Part E(2), *supra.*

(c) Since the court's consent order reflected that no other party has an interest in parcel 7a, plaintiff and Irvin and Violet Sewer will proportionately share the remaining Martin Sewer interest. To calculate what percentage of unattributed property should be allocated to Newfound and Irvin and Violet Sewer, the court performed the following operations: 86.36363 + 2 = 88.36363 (88.36363 = 100% of property owned by Newfound and Irvin and Violet Sewer); 86.36363/88.36363 = Newfound's interest = 97.7366% of the whole; 2/88.36363 = Irvin

and Violet Sewer's interest = 2.2634% of the whole.

(d) The court finds that plaintiff holds 97.7366% of Martin Sewer's interest in parcel 7a.

(e) The court finds that Irvin and Violet Sewer hold 2.2634% of Martin Sewer's interest in parcel 7a.

(iii) *Final Ownership Percentages*

(a) Since Martin Sewer had a 50% interest in parcel 7a, Newfound possesses ownership interests in 97.7366% of 50% of the total acreage and Irvin and Violet Sewer possess ownership interests amounting to 2.2634% of 50%. Both Newfound and the Sewers also gained an percentage (10.8938%) of Adelaide Williams interest in parcel 7a by virtue of the de facto partition.

(b) Thus, by adding up each total ownership interest by party and dividing by the total amount of available interests, the court finds that Newfound holds 72.42031% of parcel 7a's ownership interests. (97.7366 + 10.8938 = 108.6304/149.9999 = 72.42031.) The court further finds that Irvin and Violet Sewer hold 8.77147% of the ownership interests (2.2634 + 10.8938 = 13.1572/149.9999 = 8.77147) and that Bernard William's estate holds 18.80821% (28.2123/149.9999 = 18.80821) of the ownership interests.

## CONCLUSIONS OF LAW

This case requires the court to resolve legal issues which primarily relate to 1) identifying and locating real property and 2) the conveyance or ownership of real property. To identify or locate parcels of property the court must look at the original documents, such as deeds or survey reports, defining a parcel. By analyzing legal descriptions within deeds, comparing surveys and surveyor's reports, the court evaluates the legal description, weighing its contents, and related surveying documents to locate the parcel on the ground. To determine whether property has been conveyed or transferred properly, the

---

**20.** Newfound has provided the court with copies of nine unrecorded deeds obtained from Sewer heirs. The court is unclear why the deeds have not been recorded. Nevertheless, in the interest of quieting title to this parcel, the court relies on Newfound's representation that the deeds are authentic and will be recorded.

court considers whether the parties have transferred title to land pursuant to the Virgin Islands' recording statutes. The legal analysis required to determine questions of ownership and title in this case is somewhat more discrete than the analysis necessary to identify a parcel's location.

Because there are numerous parcels at issue, repetitive legal questions arise concerning the location of property on the ground and the evaluation of surveying practices. To avoid duplicative analysis, in determining each parcel's boundaries, and to focus the reader's attention on the detailed facts at issue, the court has set forth the generally applicable law regarding these common underlying issues in the following preliminary sections. Specifically, these sections summarize law relating to locating property, surveying concepts and the surveying traditions in the Virgin Islands.

While both parties have raised other subsidiary issues during the course of this litigation, the court has focused primarily on resolving questions of fact and law relating to location and title. As the court deals with each parcel, the court will note the subsidiary questions of law which arise with respect to each specific parcel and which require resolution by this court.

## I. GENERAL SURVEYING PRACTICES

### A. *Background Research*

■ The court will first set forth basic principles of surveying based on its review of relevant treatises and case law as well as the expert testimony offered at trial by the parties.[21] A surveyor should strive first to locate and examine all historical records, deeds, prior surveys, maps and drawings in preparation for conducting an original survey. *See, generally*, CURTIS BROWN ET AL., BOUNDARY CONTROL AND LEGAL PRINCIPLES 371–74 (3rd ed. 1986) [hereinafter "BOUNDARY CONTROL"]; WALTER G. ROBILLARD & LANE J. BOUMAN, CLARK ON SURVEYING AND BOUNDARIES § 4 (5th ed. 1987) (hereinafter CLARK ON SURVEYING) If the surveyor is not performing an original survey then the surveyor must also carefully review the original survey, as well as subsequent surveys or drawings.[22] The purpose of thoroughly researching the history of a parcel of land is to ensure that the surveyor will be able to incorporate the most complete and accurate data into his or her survey. If a surveyor does not complete such research, the surveyor might perform the survey without having the benefit of essential information. For instance, the surveyor might not adequately search for crucial monuments or might misinterpret other field or documentary evidence. BROWN, BOUNDARY CONTROL at 371. In addition, if a surveyor knows that his or her survey will be used in a particular manner, a surveyor should review relevant documents and field surveys of adjacent parcels of land to ensure that his or her particular survey will be reliable and consistent with other existing surveys, so as to discourage litigation. *Id.* at 374.

### B. *Field Surveys*

After a surveyor has completed a comprehensive review of all available records, deeds and prior surveys, the surveyor begins the field survey. Once in the field, the surveyor has a duty to make a diligent search for all monuments referenced directly or indirectly in the deed or property description that either occur naturally or were put in place by prior surveyors or other persons. *Id.* at 371.

---

**21.** At the outset, the court recognizes that a surveyor is a licensed professional with specialized training who is presumed to be impartial. *See, generally*, ROBILLARD, CLARK ON SURVEYING § 2 ("The Surveyor, His [sic] Rights, Duties, Liabilities") The surveyor should at all times maintain the highest degree of personal ethics with respect to his [sic] work, and not be influenced one way or another in the face of facts which convince him that a certain course is wrong. He should be as free from prejudice or influence favorable to one or the other party as a judge on the bench or a juror in the box.

*Id.* at 32.
On occasion, a surveyor may be forced to give up work if a client asks the surveyor to falsify boundaries or deliberately draw an incorrect map to benefit the client.

**22.** When a surveyor goes on the land and relocates an original surveyor's monuments, this subsequent survey is technically known as a "resurvey." This section of the court's opinion, however, uses the terms interchangeably.

Monuments have special significance because monuments indicate the location of property at issue on the ground. The search for monuments must continue until the monuments are located or until there is an explanation for their absence. *Id.* at 372. If necessary, the surveyor should consult former surveyors, landowners, residents, or other knowledgeable parties to determine monument sites or obtain other information tending to show where a piece of property should be located. *Id.* Testimony of neighbors and informed residents concerning boundaries is an important source of information for resurveys. *Maplesden v. U.S.,* 764 F.2d 1290, 1291 (9th Cir.1985). As stated in one treatise, "[a] diligent, thorough, and complete search for all evidence is the fundamental essence of land surveying." BROWN, BOUNDARY CONTROL at 372. Through these investigative efforts, the surveyor attempts to reach his or her goal: the "location of land boundaries in accordance with the best available evidence" even though the best evidence may be "mere hearsay or reputation." *Id.* at 372–3; *see* Part II(B) *infra* on determining the order of importance of conflicting descriptive elements in a conveyance.

### C. The Centrality of the Original Survey

Since the physical position of monuments referenced in a conveyance reflect the original boundaries of a particular parcel, a subsequent surveyor must attempt to conform his or her survey as closely as possible to the prior surveyor's work. Hence treatises and courts frequently recite an admonishing maxim, namely that a surveyor must follow in the footsteps of the original surveyor. *See* Rudolph Galiber's Testimony (Tr. 1B, p. 35.), Marvin Berning's Testimony (Tr. 2, p. 112–114). The purpose and result of this principle is to give effect to the intentions of the parties at the time of the survey as well as ensuring the continuity of boundaries over time. Accordingly, "[t]he general rule governing the determination of boundary lines by resurvey is that the intent of the new survey should be to ascertain where the original surveyors placed the boundaries," not to determine new modern boundaries. *Thein v. Burrows,* 13 Wash.App. 761, 537 P.2d 1064, 1065 (Wash.App.1975); *see, also, U.S. v.*

*Champion Papers, Inc.,* 361 F.Supp. 481 (S.D.Tex.1973) (boundary dispute involving 135–year–old survey resolved by the court's attention to totality of the evidence including evidence of the parties' intentions).

### II. DETERMINING THE INTENT OF PARTIES TO A CONVEYANCE

While a surveyor must aspire to walk in the exact steps of an original surveyor, sometimes a surveyor may be unable to find monuments placed by the original surveyor because the monuments may have been obliterated or lost. When a surveyor is unable to follow the precise "footsteps" of his or her predecessor, then a surveyor must attempt to track the original surveyor's work using whatever recoverable evidence that exists. *See, generally,* ROBILLARD, CLARK ON SURVEYING § 14 (section on tracking a survey); 11 C.J.S. § 61. Ultimately, a surveyor may only be able to "say with a great degree of certainty, 'this is where the surveyor walked.' " *See,* BROWN, BOUNDARY CONTROL at 294.

### A. Original Survey Lines or Lines of Possession?

When a surveyor has difficulty retracing the original surveyor's steps, either because field evidence is missing or conflicting, certain principles guide his or her evaluation of existing field evidence. First, because original lines control other information contained in the conveyance, a surveyor should determine whether or not a line of possession, such as a fence, marks the location of the original survey line. *See* ROBILLARD, CLARK ON SURVEYING § 16.17. For instance, if the possession line is marked by an old boundary fence erected at approximately the same time as the original surveyor ran the lines, the fence may memorialize the survey line itself. BROWN, BOUNDARY CONTROL at 372. A surveyor's determination that a line of possession corresponds with an original survey line should be made according to the best evidence available which may include testimony of residents and the evaluation of the age of fencing or other natural monuments. *Id.* In addition, where surveyors disagree on the location of property lines and where a true

survey line may be uncertain, monuments, such as fences which mark a possession line and which were established soon after the original survey, will control. *Id.* at 89 and 93.

In the context of a surveyor's inability to locate original monuments or the original survey lines, lines of possession may become significant precisely because they give effect to the conveyer's intentions. This is particularly true when a conveyance contains a written statement describing these intentions. Accordingly, where a deed contains such a recitation of the parties' intentions, a surveyor should compare all of the conflicting descriptive elements, such as lines of possession, monuments, and acreage, and give the most weight to the element or elements which best effectuates the intentions of the parties to the deed. *See* BROWN, BOUNDARY CONTROL at 82.

## B. *An Ordering System*

### 1. In The Virgin Islands

■ When a legal description in a deed is ambiguous, territorial law guides a surveyor's efforts to resolve unclear terms. *See* 28 V.I.CODE ANN. tit. 28 § 47 (Supp.1978)[23]; *see, generally, M.B.M. Inc. v. George,* 655 F.2d 530, 533 (3d Cir.1981) ("sufficient circumstances" supported the proper construction of the conveyance, including evidence of the grantor's intent, so that the trial court did need not resort to the statute to interpret the deed); *Roebuck v. Hendricks,* 255 F.2d 211, 211–12 (3d Cir.1958) (a legal description referring to the conveyance of an undivided

parcel of property merely in terms of acreage was overly vague and unenforceable). When a surveyor construes a description in a conveyance, the surveyor will look first to permanent or ascertainable monuments or boundaries, then to lines, angles, and finally surface area. Permanent or ascertainable monuments or boundaries are paramount over lines, angles or surface area in that order. These Code provisions have guided the court's consideration of legal descriptions contained in conveyances and its review of surveyors' interpretations of these same descriptions.

■ Territorial law parallels general surveying conventions. In general, if the boundaries of a parcel are unclear, the deed or other historical documents include conflicting descriptive elements, and there is no one element which expresses the concerned parties' intent, then a surveyor may turn to a widely accepted ordering system. Courts and surveyors use this ordering system as a means of weighing and choosing between different descriptive elements. For example, the relative importance of conflicting elements is, in descending order, a) original surveyed lines, b) natural monuments, c) artificial monuments, d) metes and bounds descriptions, e) courses and distances, and f) quantity and acreage. *See, generally,* 11 C.J.S. *Boundaries* § 49–57; *see also Kruger & Birch v. Du Boyce,* 241 F.2d 849, 853 (3d Cir.1957).

### 2. Monuments

Existing and undisturbed monuments called for in a conveyance are afforded the

---

**23.** The statute reads in pertinent part:

The following are the rules for construing the descriptive part of a conveyance of real property when the construction is doubtful and there are no other sufficient circumstances to determine it:

(1) Where there are certain definite and ascertained particulars in the description, the addition of others which are indefinite, unknown, or false does not frustrate the conveyance, but it is to be construed by such particulars, if they constitute a sufficient description to ascertain its application.

(2) When permanent and visible or ascertained boundaries or monuments are inconsistent with the measurement, either of lines, angles, or surfaces, the boundaries or monuments are paramount.

(3) Between different measurements which are inconsistent with each other that of angles is paramount to that of surfaces and that of lines paramount to both.

\* \* \* \* \* \*

(5) When the shoreline is the boundary, the rights of the grantor to the line of mean high tide, subject to the right of the public to make reasonable recreational use of the shoreline, as "shoreline" is defined in section 402 of chapter 13 of Title 12 of this Code, are included in the conveyance.

(6) When the description refers to a map, and that reference is inconsistent with other particulars, it controls them, if it appears that the parties acted with reference to the map; otherwise the map is subordinate to other definite and ascertained particulars.

most weight and are given precedence over distance, direction or area. BROWN, BOUNDARY CONTROL at 89. In turn, natural monuments like a well-known tree or large rock, take precedence over artificial monuments like a fence, stake or ditch, because they are fixed and naturally occurring. Since monuments or objects afford greater certainty than computations of courses or distances, the "true intention of the parties will more probably be ascertained by adopting the call for natural monuments." *Kruger & Birch,* 241 F.2d at 853; *see also U.S. v. Doyle,* 468 F.2d 633, 636 (10th Cir.1972).[24] If a monument is obliterated the testimony of residents, witnesses, or other surveyors may reestablish its original location. BROWN, BOUNDARY CONTROL at 87.

### 3. Acreage

 In contrast to monuments, the most credited elements of a description according to the canons of construction, quantitative elements, such as stated acreage, have the least relative importance. "In the determination of boundaries of land, quantity or area has been variously declared, with qualifications ..., the least certain or reliable element of description, ... without weight or effect, ... the last element to be resorted to." 11 C.J.S. *Boundaries* § 57 (1938). When a conveyance includes a description of acreage combined with the words "more or less," the element is a recognized approximation. As such, acreage is less reliable as a means of determining the location and boundaries of the described property when more substantial evidence exists.

 Consequently, if an individual purchases property from a seller who intended to convey certain defined property described in the conveyance by metes and bounds and approximate acreage "more or less," the stated acreage loses its authoritative value if a subsequent survey shows that the property is larger or smaller than the stated acreage. *Thorp v. Smith,* 344 F.2d 452, 454–55 (3d Cir.1965). The purchaser's holdings are limited by the seller's intent to convey the cer-

tain parcel as described by metes and bounds. The stated acreage does not entitle the purchaser to any more or less property. In *Thorp,* the court stated the "phrase 'more or less" indicated merely that 13 acres was the approximate and not the precise area of the parcel of land which was conveyed by designation. While a survey may demonstrate that a stated acreage amount is incorrect, a survey may not carve out (or eliminate) parcels of adjacent land and add them to the first parcel to increase (or diminish) the acreage to conform to the quantitative description in the deed. Similarly, in *Pendall v. Virgin Islands Title & Trust Company,* 6 V.I. 105, 106–7, 279 F.Supp. 733, 734–35 (D.C.V.I.1968), where plots of land were pointed out to the purchaser and described by metes and bounds on a survey plan, the deed's description by metes and bounds prevailed over an inconsistent reference to acreage.

### 4. The Cumulative Weight of the Evidence

Even though monuments usually control other inferior descriptive elements, occasionally, upon examination of all of the different elements, a surveyor may conclude he or she should follow the inferior elements called for in a conveyance rather than a particular monument. Surveyors should be sensitive to the weight of the evidence when all the relevant elements are considered. For instance, a surveyor may locate property according to the distances and area described in a deed rather than relying on a monument because the distances and area taken together seem to better reflect the original intentions of the parties to the conveyance. Better surveying practice requires a surveyor to evaluate initially all of the available evidence, even if ambiguous, regardless of its character. Then the surveyor should draw his or her conclusions based on the most persuasive information, rather than blindly relying on an abstract ordering scale to evaluate evidence on his or her behalf. BROWN, BOUNDARY CONTROL at 88–9.

---

**24.** The Bible itself guides the contemporary surveyor's respect for even artificial monuments, "Cursed be he that removeth his neighbor's landmark." BROWN, BOUNDARY CONTROL at 87 (quoting *Deut.* 27:17).

## III. RURAL SURVEYING AND THE VIRGIN ISLANDS

Having summarized surveying practices in general terms, the court will now turn to the Virgin Islands and the special problems presented by surveys conducted in rural areas.

The Virgin Islands challenges the contemporary surveyor in several ways, that in combination make a present-day surveyor's job quite demanding. First, sparsely populated areas often have not been surveyed in a systematic manner. Since the cost of surveying undeveloped land is often disproportionate to the value of the property, the surveying of rural areas, when conducted at all, has tended to produce scientifically imprecise surveys. This is particularly true of original surveys dating from the turn of the century or earlier. To further confound matters, early surveyors appear to have followed regional surveying practices based on custom.[25] Second, the Danish history of the Islands complicates conducting historical research. Reviewing essential reference documents such as deeds and land lists is more intricate since the surveyor must first collect and perhaps translate old documents to trace ownership of property. Moreover, the Virgin Islands system of recording is idiosyncratic and requires some familiarity.[26] Third, a warm climate, heavy vegetation and rough, often hilly, terrain in undeveloped areas slows a surveyor's team, making fieldwork difficult and time-consuming.[27] The court will consider each of these features in turn and in the context of the present case.

With regard to the rural character of the East End of St. John, a sparsely inhabited and relatively undeveloped area, few early surveys exist. As noted in an unreported decision by Judge Christian, the East End suffers from an "abundance of chaos ... relative to boundary lines dividing the properties of many land owners in the area." *Anton George et al. v. Sophia Christian et al.*, No. 272–1972 (D.C.V.I.1976). Since the late 1960s, some efforts have been made to harmonize and systematize surveying practice on the East End. Marvin Berning, through his company, V.I. Engineering and Surveying, performed an aerial survey in 1966 of the entire East End area, set up control posts using iron pipes placed throughout the area and oriented the survey and control post system to a 1966 magnetic north grid. (Tr. 2, p. 19–22). The existence of the aerial survey has permitted subsequent surveyors to prepare surveys with an eye to developing a composite map of the area. Report of Commissioner, Leonard Lawrence, in *Anton George*, No. 272–1972 at 4.

In the present case, the earliest survey is the Danish surveyor's, Anderson's, rough sketch on a document in 1893 illustrating and memorializing the division of the property of the George and the Sewer families on the East End. The survey consisted of a single line based on magnetic bearings that was silent as to the length of the line or other distances. According to a translation of the document, Anderson placed monuments consisting of stone piles at three points on the survey line. While the Anderson survey may be typical of early surveys conducted on sparsely developed islands like St. John,[28] its

---

**25.** *See* discussion of V.I. surveying conventions, *infra*.

**26.** Some historical background is necessary in order to understand the Virgin Islands' early land recording practices. *See, generally, Dudley v. Meyers*, 422 F.2d 1389, 1390 (3d Cir.1970). In the late 17th and early 18 century, the Danes settled St. John and divided the rural land into large agricultural tracts called "estates" to grow products such as sugar cane. These estates, each with a distinctive name, were further subdivided into separate tracts known as "quarters". When land was conveyed, the historical name, referring to a particular estate and quarter, was commonly used as a geographical unit to identify and describe the transferred portions.

**27.** Berning testified that to walk and survey parts of the East End, particularly the western slopes, one needs a machete to cut overgrown cactus and bush. A surveyor's progress is slow, perhaps only six or seven hundred feet a day. In sharp contrast, mainland surveyors survey thousands of feet a day. (Tr. 2, p. 31).

**28.** Surveying treatises detail the special features of old surveys, particularly in undeveloped areas. For instance, Puerto Rico, where private land titles were derived from Spain, land grants were large like the estates on St. John. The size of the estates similarly made it difficult for a surveyor to complete a detailed survey. And when the land was subdivided, the surveyed parcels were often irregular in size and only described by metes and bounds. To simplify the surveying

limited description has hampered subsequent surveyors as they have attempted to relocate Anderson's lines with conflicting results.

Since Anderson's survey, the original survey on the southern portion of the East End, includes few descriptive elements, referring only to monuments and bearings, the court has sought other sources to inform its findings, including a search for information about specific surveying traditions of St. John. Although the court has searched in vain for a learned treatise on Danish or Virgin Islands surveying practices, a review of V.I. case law and the parties' exhibits revealed three apparent St. John conventions.

First, V.I. surveyors relied on topographical features as natural monuments. Judge Christian has noted that "where natural ridges are found, these may be followed for it does appear that such was the surveying practice in St. John in the Danish times." *Anton George*, No. 272–1972 at 3. Judge Christian's conclusion accords with scholar Curtis Brown's generalization that early surveyors used natural topographical features like ridges and streams as monuments.

Second, V.I. surveyors estimated quantities of land, when recording total acreage, ignoring land which could not be cultivated. In the *Anton George* opinion, *supra*, Judge Christian recognized that

"It appears to have been the practice in the days of the forebears of these litigants to estimate areas. It was also their wont to consider non-arable land as worthless and it seems that they eliminated such "worthless" land from their area calculations. The result is that the hillside slopes with their commanding view, that once were treated as no value, are now regarded as though there is gold buried in those hills...."

*Anton George*, No. 272–1972 at 2. Berning confirmed that as a result of his thirty years of experience surveying on the East End he discovered that a parcel's actual size rarely corresponded with the purported acreage stated on a land list or conveyance. (Tr. 2, p. 46).

Third, V.I. surveyors used hardwood boundposts as boundary monuments. According to a seasoned V.I. surveyor, Leonard Lawrence, hardwood boundposts are "much older than ... you and I. That's what they used to mark ... [the boundaries] in those days." Dep. Test. of Leonard Lawrence, *Anton George*, No. 272–1972 at 28; Pl.'s Ex. 155. Thus, old hardwood boundposts have considerable importance as artificial boundary monuments.

As a consequence of these three distinctive V.I. conventions, as the court has reached its conclusions and considered the cumulative weight of all of the evidence presented, the court has carefully noted the topographical features of the disputed parcels, has given significantly less weight to stated acreage and acknowledged the likely significance of hardwood boundposts.

## IV. SURVEYING ON THE EAST END

Having summarized basic surveying practices as well as early survey traditions specific to St. John, the court turns its attention to solving the boundary and title disputes at issue in the present case.

### A. *The Significance of the George–Sewer Line*

The location of the George–Sewer line [G–S line] surveyed by Anderson in 1893, being the original survey of the southern East End, controls the locations of later-surveyed parcels. BROWN, BOUNDARY CONTROL at 294. The line, A–B–C–D, was marked with stone piles on points B and C and at two places on the C–D lines and was based on magnetic bearings. This line divided the southern East End of St. John with all George family

process and establish clear bounds, surveyors often followed natural features including streams, trails, fences or ridges to set boundaries. BROWN, BOUNDARY CONTROL at 353.

Other courts have recognized that early surveys of rural areas have limited accuracy. In a case involving land on Sanibel Island, a Florida district court noted that "some margin or error should be anticipated and allowed due to the wild and remote nature of the land with concomitant low value in relation to the cost of the survey at the time the work was done." *United States v. 295.90 Acres of Land, More or Less*, 368 F.Supp. 1301, 1307 (M.D.Fla.1974), *aff'd*, 510 F.2d 1406 (5th Cir.1995).

holdings to the north of the line and Sewer family holdings located to the south. Pl.'s Ex. 15. Anderson did not give distances or refer to specific monuments other than the stone piles. A later agreement, the 1913 Agreement, between the East End property owners used the G–S line to denote how properties would be numbered; parcels designated with a "6" were north of the line and those designated with a "7" to the south, a "7". Pl.'s Exs. 16, 173. Before a surveyor could conduct a perimeter survey of a property adjacent or near the G–S line, the surveyor would have to first determine its parcel number and then, situate the parcel north or south of the line accordingly. In order to situate the parcel, the surveyor would need to know the G–S line's location.

Plaintiff contends that its expert Marvin Berning identified the G–S line as depicted on Berning's composite map. Pl.'s Ex. 199 and the court's Appendix A. The composite map references another surveyor's recorded survey to set the A–B segment of the G–S line, P.W.D. No. D9–491–T65. Pl.'s Ex. 177. An early Berning survey, filed as P.W.D. No. A9–166–T71, establishes the B–C segment. Pl.'s Ex. 161. The C–D segment runs from a hardwood boundpost, Point C on the composite map, along a fence line to two other boundposts to the sea. Pl.'s Ex. 199.

Defendants challenge Berning's location of the G–S line and submit a survey of the line by their expert, Rudolph Galiber, to refute Berning's conclusions. Defendants rely heavily on Galiber's survey, appended to the opinion as Appendix B, which if correct would undermine Berning's location of parcels 6–0, 6–0–1, 6–0–2, and 6f as well as the recorded perimeter surveys of each. This survey of the G–S line was the only survey Galiber performed for defendants; he did not conduct perimeter surveys of the disputed parcels.

1. Berning's Testimony

Berning testified that based on his nearly thirty years of experience surveying on the

East End of St. John, he correctly identified the G–S line as early as 1970. (Tr. 2, p. 83, 101). He reviewed the documentary evidence, including the 1893 Anderson survey report, and conducted field visits to locate the stone piles and reestablish the G–S line in accordance with proper surveying techniques. (Tr. 2, p. 83). While searching for Anderson's monuments, he found stone piles surrounding hardwood boundposts at the place designated Point C on the composite map as well as at two places on the C–D line. (Tr. 2, p. 76, 94)[29]. The hardwood boundposts marked an old fence line that followed a natural ridge in a southern direction towards the sea. (Tr. 2, p. 84). Thus, Berning concluded that he had identified the C–D line as Anderson's survey described it.

Berning located the B–C segment of the G–S line by following an old unbarbed wire fence along a natural ridge southwest from Point C. In his testimony, he explained the significance of old wire:

Q: What importance did you attach to the old barbless fence that you found in the fields?

A: We attached quite a bit of importance to them. It was an indication that, especially when you get to the old barbless wires which I think were used probably in the early 1900s or the late 1800s, they were the older wires and we usually found them lying just on the ground. On occasion you would find some embedded in trees but as you trace those out and then read the land lists and absorb what people tell you about adjacent owners and just pick up everything you can and put it in your head and then try to come up with a map. This is—it's not an easy task.

(Tr. 2, p. 48).[30] The presence of barbless wire then indicates that the fence along the B–C line was erected soon after the Anderson survey divided the East End. Such evidence strongly suggests that the

---

29. Berning did not identify Point D and indicated that, if he were asked to record an official survey of the line, he would go back into the field to try to locate that point. (Tr. 2, p. 118).

30. Barbed wire is a more modern invention, not developed until the 1870s. See *Washburn & Moen Manufacturing Co. v. Beat'Em All Barbed-Wire Co.*, 143 U.S. 275, 280, 12 S.Ct. 443, 445, 36 L.Ed. 154 (1892).

fence line was a title line rather than a line of possession. (Tr. 2, p. 88).

Two persons on separate occasions confirmed the location of the ridge's significance as a boundary line, Henry Sewer, the oldest member of the Sewer family and a non-party, and Bernard Williams, whose estate defendant Cedric Lewis represents. Berning testified that when Henry Sewer visited the East End with him, Sewer told Berning that Sewer family property extended south from the area of Point B. (Tr. 2, p. 70). And when Bernard Williams sought Berning's services as a surveyor in 1969 Williams stated that the ridge line leading up to Point C was the G–S line. (Tr. 2, p. 84).

In addition to speaking to persons with knowledge of the East End, Berning measured the angles of his G–S line. Upon measurement, the B–C and C–D angles conformed closely with Anderson's survey. (Tr. 2, p. 102). The angle A–B was not as close as the other angles. Pl.'s Ex. 15; Tr. 2, p. 82.

Berning also compared the purported acreage of the Sewer land south of the G–S line, stated in Anderson's survey report to his measurement of the property south of his G–S line. Berning calculated that approximately 84 acres lie south of the present-day G–S line compared to 78½ acres recorded by Anderson.

From the cumulative weight of the evidence—field evidence including the fence lines, hardwood boundposts and stone piles, the natural ridges, statements from local persons, and the measurement of the interior angles and acreage—convinced Berning that he had correctly located the G–S line. (Tr. 2, p. 103). He acknowledged, however, that he never recorded a formal survey of the G–S line and is less confident about the A–B segment. (Tr. 2, p. 82, 94).

### 2. Galiber's Testimony

In preparation for his testimony in this suit, Rudolph Galiber, defendant's expert, surveyed the G–S line after reviewing other surveys and historical documents, spending approximately eight hours looking for field evidence over two days. (Tr. 1B, p. 50, 89).

He had not previously conducted a survey on the East End of St. John. (Tr. 1, p. 45–6). Galiber first contacted the Geophysical Data Center to identify the declination of the magnetic needle in 1893 so that he could accurately identify Anderson's survey lines based on the bearings Anderson specified. (Tr. 1B, p. 48). He then analyzed Anderson's survey sketch, a small drawing with three points and lines superimposed on a tracing of an old map of the shoreline and compared the proportions of Anderson's three line segments, A–B, B–C, and C–D. (Pl.'s Ex. 15) Then he went into the field, looked for Anderson's monuments, the stone piles, identified one stone pile, as referenced on a Berning recorded survey map, and struck his lines and angles accordingly. (Tr. 1B, p. 48–52). Galiber did not locate Points A, B or D; B appeared to be obliterated by development. (Tr. 1B, p. 52, 68).

Galiber's survey thus differed from Berning's in the following three ways. First, Galiber located his Point C approximately 400 feet north of Berning's Point C based on Galiber's identification of a stone pile that Berning has noted on a recorded survey map. (Tr. 2, p. 122) (See Appendix B). Second, Galiber emphasized the importance of striking lines according to magnetic bearings properly adjusted for declination over 100 years because Anderson as the original surveyor called for bearings. Third, Galiber attempted to approximate distances for two segments, A–B and B–C, of the G–S line based on Anderson's survey sketch. Berning, on the other hand, having identified a different Point C, a hardwood boundpost surrounded by stones, neither used magnetic bearings to run his survey lines nor interpreted Anderson's sketch to fix the lengths of lines A–B and B–C.

### 3. Locating the George–Sewer Line

After listening to the surveyors' testimony, comparing their survey drawings and considering the historical documents, the court finds Berning's relocation of the B–C–D section of the G–S line significantly more credible and much more grounded in substantial and convincing evidence than Galiber's survey.

Galiber fatally undermined his own work when he admitted that if his Point C was incorrect he could not accurately strike Anderson's survey lines. (Tr. 1B, p. 64–5). Unfortunately his reliance on Berning's notation on a survey map "boundpost placed by pile of stones" was completely misplaced. Defts.'s Ex. D1A, D1B. The court believed Berning's testimony that the stone pile in question, Galiber's Point C, was actually placed in the early 1970's by Anton George, a long-time East End resident, during a field visit with Berning. (Tr. 2, p. 57, 97–100). George placed the stones to mark an existing iron pipe which designated a boundary of George family property. Defendant Irvin Sewer's testimony did not dispute Berning's explanation, testifying that he saw the pile of stones sometime after 1974 following Anton George and Berning's field visit. Since the pile of stones is of recent origin, it clearly could not be one of Anderson's called for monuments. Therefore, the court must disregard Galiber's survey of the G–S line.

Although Galiber's survey turned out to be demonstrably inaccurate, perhaps because he had little experience on the East End and a limited focus, his testimony provided the court with a standard against which to evaluate Berning's surveying practices. The court finds that Berning followed correct surveying techniques, relying on the best available evidence to reconstruct the intentions of the original parties to the Anderson survey.

a. Should Berning Have Relied More Heavily on Anderson's Calls for Magnetic Bearings?

Based on the rough character of Anderson's survey, Berning did not need to overemphasize the significance of magnetic bearings, even though Anderson did call for bearings. Calls for magnetic bearings in old surveys present difficult problems for contemporary surveyors. Two compasses may give substantially different bearings for the same line even if the two readings are taken at the same time. BROWN, BOUNDARY CONTROL at 113. The readings vary according to the weather, topography and surrounding objects, and are subject to daily and annual declination. As years pass, it becomes nec-

essary to control for declination and correct contemporary bearings to follow original survey lines. *Id.* at 113–14. As Galiber correctly noted, a surveyor may consult the National Geodetic Survey tables to identify declination changes in the absence of a reliable bearing reading on which the surveyor may rely. *Id.* (Tr. 1B, p. 47–9). Unfortunately, no one can identify how weather conditions or topographical features could have interfered with Anderson's original compass readings. The only remaining evidence of Anderson's line are the old fenceline and hardwood boundposts on the C–D segment of the G–S line. The court finds this field evidence much more compelling than Anderson's imprecise magnetic bearings that were subject to an unknown number of variables. Significantly, Galiber did actually adopt the general direction and location of the C–D segment even though he placed his Point C farther to the north on the same basic C–D line. (Tr. 1B, p. 50, 76–8). Therefore, the court finds no reason to emphasize magnetic compass readings instead of field evidence relied upon by both parties.

b. Should Berning Have Extrapolated the Length of the G–S Segments from Anderson's Survey?

Since Galiber stressed bearings and proportionate distances, the court considered whether Berning should have tried to approximate the lengths of the A–B and B–C segments differently. The court concludes that Anderson's sketch is not sufficiently precise to justify such an attempt. Anderson's drawing does not indicate distance and seems to be merely a quick approximation of the G–S line. There is no scale to follow to identify the lengths of the segments and no geographical features noted, other than an eighteenth century shoreline, to follow.

c. Did Berning Properly Identify Title Lines Reflected By the G–S Line Through Careful Weighing of Field and Testimonial Evidence?

 The documentary evidence unquestionably reveals that Anderson surveyed this large rural tract of land quickly, in a single day, nearly one hundred years ago. Even he

considered his survey imprecise, stating that it merely approximated stated acreage. Additionally the Georges and Sewers acknowledged that Anderson had not done a "proper survey" but that they knew what they owned. Pl.'s Ex. 15, 17, 163. In light of these admissions, longtime residents of the East End were the most likely to know where the Anderson boundary lies. Owners of property presumptively know what they own and their lands' boundaries. See, e.g., *Jackson v. Smith*, 19 V.I. 361, 367 (1983) (quoting *Piazzini v. Jessup*, 153 Cal.App.2d 58, 314 P.2d 196 (1957)). Their old barbless fence lines, lines of possession, were likely boundary lines erected soon after the Anderson survey and should be regarded in this case as artificial monuments. Since the fence lines were artificial monuments marking old survey lines they take precedence over slightly different compass bearings. Thus, the court finds that the fence lines here are monuments reflecting residents' knowledge of boundary lines. These fencelines, rather than Anderson's references to bearings, more accurately denote the G–S line.

In addition, the court finds Berning's reliance on natural monuments persuasive. Berning located the B–C–D line on natural ridges. It is highly likely that Anderson, consistent with rural surveying practices of the time, probably followed natural topographical features. Using the earth itself as a monument would have simplified the necessary fieldwork, permitting Anderson to finish his survey in a day and providing residents with an easily identifiable and enduring boundary line.

Significantly, Berning did locate three likely Anderson monuments, the three hardwood boundposts on the C–D line. These boundposts were probably old boundary markers.[31] Although his composite map designates the monuments as hardwood boundposts, he testified that the hardwood boundposts were also marked by stone piles. As such, his fieldwork effectively located called for monuments. The existence of the stone piles on the old fence lines further justifies the court's conclusion that the fences along B–C–D were boundary lines not just fences erected to pen livestock or for some other purpose.

Berning's other research, collecting testimony from knowledgeable persons, comparing Anderson's angles to his own and measuring acreage, also supports Berning's conclusion that he correctly identified the G–S line. Under the circumstances, where testimonial evidence corroborated physical evidence, Berning's reliance on statements from local persons was appropriate. "In some areas of the country, the surveyor must, of necessity, have greater reliance on hearsay or recognition in arriving at his [sic] conclusions." BROWN, BOUNDARY CONTROL at 376.

As required by good surveying practice, Berning compiled all available evidence, combining documentary, testimonial and field evidence, to trace the original surveyor's footsteps to the greatest extent possible and to give effect to the George and Sewer families original intentions. Over many years, he made a thorough search for physical evidence on the ground and he balanced the information he learned, giving the most credence to natural and artificial monuments. He did not over-emphasize more abstract information like magnetic bearings and acreage that may be subject to human error in the face of persuasive field evidence. His work properly reflects the cumulative approach to evidence urged by surveying treatises.[32]

### d. The A–B Segment

At this time the court will not adopt the A–B segment of Berning's G–S line for the following reasons. First, Berning testified that he has not conducted a formal survey of the G–S line. (Tr. 2, p. 115). He indicated that more work would be required to prepare a survey map of record. Second, his testimony reflected some uncertainty about this segment. During cross-examination, he was only certain that B–C–D was correct, not A–

---

31. The court has suggested that St. John surveyors used hardwood boundposts as monuments. See Conclusions of Law, Part III, *supra*.

32. Scholars encourage surveyors to take a comprehensive approach to evidence and demonstrate how surveyors may give more weight to some conflicting descriptive elements than others. See Conclusions of Law, Part IIB *infra*.

B–C–D, and admitted that the A–B–C interior angle strayed farther from Anderson's reported angle. (Tr. 2, p. 104). Third, to identify the A–B segment Berning relied on another surveyor's work. This other surveyor, Floyd George, conducted a perimeter survey of a parcel of land known as 7b. Having examined George's survey map, there is no evidence to suggest that George reviewed Anderson's survey report or tried to identify the G–S line before conducting his survey. Since George's survey does not attempt to depict the A–B segment and notes ruins and other physical evidence that might aid a future surveyor's attempt to resurvey the A–B segment, the court does not find that the George survey, at this time, merits Berning's reliance. For these reasons, the court rejects Berning's A–B segment of the G–S line.

Determining the A–B segment of the G–S line should be part of the as yet uncompleted survey of parcel 6p. The A–B segment will form the southwestern boundary of the parcel, running from Point B to the Bay. The surveyor who the owners of parcel 6p retain to do the perimeter survey of their property should first review all of the relevant documentary, testimonial and field evidence already assembled as a prelude to performing parcel 6p's perimeter survey.

## V. THE PARCELS

The following analysis sets forth the location and ownership of the disputed parcels of land. The court notes that it reached the following conclusions only after extremely careful deliberation, recognizing that the defendants regard this land as family property. The court made these decisions on the basis of evidence presented by the parties, with an eye to providing definite boundaries for the future and a sense of finality, and, thus, drew reasoned inferences to locate the disputed parcels.

A. Location and Ownership of Parcels 6–0, 6–0–1, 6–0–2, 6f, 6Y, 6Z and 10

### 1. Parcel 6–0

#### a. *Location*

Plaintiff claims that Parcel 6–0 should be located as shown on a survey by Marvin Berning for V.I. Engineering filed as P.W.D. No. D9–4311–T88. Newfound also alleges that Parcel 6–0 only represents the Roberts section of the larger property historically known as Longbay No. 1. *See* Findings of Fact, Part B, *supra*. In other words, other sections of Longbay No. 1, namely property held by Ann Marie George (allegedly Parcel 6–0–2), Mary Elizabeth Boynes (allegedly Parcel 6–0–1) and James Wellington George (allegedly Parcel 10) referenced in the 1913 Agreement, would be located outside of Parcel 6–0.

Defendants assert that Parcel 6–0 is depicted on a 1956 survey performed by surveyor Louis Harrigan, recorded as P.W.D. No. G9–402–T56. They challenge Berning's resurvey of Harrigan's survey lines, specifically contesting Berning's extension of the boundary lines to the sea on the western boundary, and Berning's calculation of acreage. In addition, defendants argue that Parcel 6–0–1, 6–0–2, 10, and 6f must be located within the bounds of Parcel 6–0.

This parcel's numerical designation locates the property north of the George–Sewer line. None of its boundaries are dependent on the location of the line itself. App. A. As a result, to follow the original East End surveyor's footsteps only requires that the court locate the property north of the G–S line. *See* Findings of Fact, Part I(A), *supra*.

Louis Harrigan performed the original perimeter survey of this parcel in 1956. Although Harrigan followed an existing fenceline when performing his survey, his calls and map reflect straight lines. Harrigan's formal depiction of the fenceline, however, does not negate the fence's significance as reliable field evidence on which Harrigan based his survey.

As a matter of law, this survey controls future surveyor's maps of the same property, specifically Berning's 1969 and 1987 resurveys. Nevertheless, as summarized below, persuasive field and testimonial evidence suggests Berning's 1969 resurvey is a significantly more definitive and precise redrawing of the original bounds that Harrigan identified than Harrigan's 1956 map.

■ Defendants objected to Berning's 1969 survey, arguing that Berning did not accurately retrace Harrigan's footsteps as he performed a resurvey of parcel 6–0. The initial question to be resolved is whether Berning should have followed existing fencelines enclosing the alleged perimeter of parcel 6–0 or the straight lines extending from boundpost to boundpost depicted on Harrigan's survey map. Old fencelines may be reliable evidence of boundary lines. *Dudley v. Meyers*, 422 F.2d 1389, 1392 (3d Cir.1970) Additionally, testimony by former residents indicating that fences were built on original lines and terminated at original corners is particularly relevant information on which a surveyor may rely. ROBILLARD, CLARK ON SURVEYING, § 1517 (1987).

Berning testified that he traced the fenceline in question which ran the entire perimeter of parcel 6–0. (Tr. 2, p. 41). In so doing, he relied on Amos Sullivan, the former resident to the north of parcel 6–0 who identified the boundary line between his property and the Roberts property. Mr. Sullivan told Berning that the perimeter of the Roberts property had been fenced for more than fifty years. (Tr. 2, p. 49). On this information, Berning followed field evidence of the fencelines, identified Harrigan's concrete boundposts to the East and calculated the acreage of the parcel at eight acres. Since the area had been fenced for more than fifty years when Berning first surveyed the parcel in 1969, the fence was erected prior to 1920.[33] Therefore, the fenceline should accurately reflect the old landowners' knowledge of property boundaries as described and documented in the 1913 Agreement. Accordingly, the court finds that the fencelines defining parcel 6–0's perimeter represent property bounds. Berning appropriately relied on Amos Sullivan's testimony to identify the fencelines.

The court also finds that the field evidence of old fencelines is more persuasive evidence of original boundary lines than Harrigan's survey map's straight lines. Berning suitably explained how Harrigan traced the fencelines, placed boundposts at major corners or bends in the fence and then drew straight lines connecting the boundposts on his map. (Tr. 2, p. 41). Since in all likelihood Harrigan actually followed the same fenceline that Berning located, Harrigan's straight lines are less persuasive than Berning's retracing of the fences on the ground. In completing his survey, Berning did not alter the footsteps of the original surveyor as much as attempt to more accurately depict on a survey map where the original surveyor actually walked. Berning's 1969 resurvey reflected the best available evidence mirroring the intent of the original landholders.

Defendants' next argument with respect to Berning's resurvey of parcel 6–0 raises the more specific issue of how to locate the parcel's western boundary. They contest Berning's depiction of the western boundary at the mean high water line of the sea rather than higher on the bank where Harrigan placed his now missing boundposts.

Defendants suggest that Berning erred in interpreting Harrigan's western boundposts as witness posts rather than as terminus points. Defendants argue that they have a claim to the land between Harrigan's western boundposts on the shore and the actual shoreline. However, the calls in the original land description for parcel 6–0, indicate that parcel 6–0 was bounded by the sea to the west. Pl.'s Ex. 21. Harrigan's survey map also designates the western bound with the words "Long Bay." (Tr. 2, p. 141). While conducting his resurvey, Berning traced the fenceline, reestablished where Harrigan had placed the shoreline boundposts called for in his survey and ran the survey lines to the mean high water mark, identifying the shoreline as the western boundary.

■ When a land description calls for the sea as a boundary, the courts interpret this call as a call for a natural monument. The shoreline, not the higher bank, then, is a property boundary. *Red Hook Marina Corp. v. Antilles Yachting Corp.*, 478 F.2d 1273, 1275 (3d Cir.1973). Specifically, title

---

[33]. Irvin Sewer also testified that he remembered fences along the northern, eastern and southern boundaries of parcel 6–0 from when he was a young man in the 1940s and 50s. (Tr. 3, p. 71– 3). At that time, his family kept cattle within the bounds of parcel 6–0. His testimony does not conflict with the information Berning gathered from conversations with Amos Sullivan.

extends to the mean high water mark along the shore. *Id; see also* V.I.CODE ANN. tit. 28 § 47(5) (1976); *see, generally,* ROBILLARD, CLARK ON SURVEYING § 29.04 (5th ed. 1987). Surveyors generally depict such a boundary by placing witness posts back from the shore to ensure that the boundposts will not be obliterated by erosion and an everchanging shoreline. This witness post is not, however, the called for monument; the sea remains the natural monument denoting the property bound. As one treatise elaborates:

> Since the water line represents the limit of ownership of the subdivider, and since the surveyor could not conveniently set a stake at a submerged location, it is assumed that the stake set upon the bank was intended only for line and the water as called for by the plat or in the description is intended to be the true termination of the line.

BROWN, BOUNDARY CONTROL, at 91. Therefore, "original monuments set on the shore control the direction of a line but not its terminus." *Id.*

The court finds defendants' argument concerning the parcel's western boundary without merit and adopts Berning's western boundary. Berning properly followed well-established surveying practices and territorial law to reestablish obliterated boundposts and properly interpret the original deed and Harrigan's calls for the shoreline as the western boundary rather than the bank. Indeed, Berning testified that, after retracing hundreds of Harrigan's surveys, he determined it was Harrigan's common practice to designate witness posts as boundposts on a survey map. (Tr. 2, p. 43–44, 137–140). Hence, he correctly interpreted Harrigan's boundpost notations on the survey map as witness posts and correctly ran his lines westward to reach the mean high water mark.[34]

Defendants mount a final challenge to Berning's location of parcel 6–0, disputing Berning's calculation of acreage at eight acres instead of the stated 3⅞ acres. They argue that the increased acreage supports their claim that Berning enlarged parcel 6–0

to include other parcels, namely 6f, 6–0–1, 6–0–2, and 10.

Surveyors who retrace old surveys in the Virgin Islands and other rural areas have found stated acreage to be the least reliable indicia of a parcel's original boundaries. *See* Conclusions of Law, Part II(B)(3), *supra; see also* V.I.CODE ANN tit. 28 § 47 (1976). The documents before the court conclusively show that landowners routinely relied on acreage approximations and did not have careful surveys performed to calculate the exact acreage they held. *See* Findings of Fact, Part A, *supra.* Even Harrigan, on whose survey defendants rely, calculated the parcel's acreage at 7¼ acres, almost twice the stated acreage of parcel 6–0.

In addition, Berning accounted for the difference in acreage in his testimony. He testified that by following the fencelines instead of straight lines and setting the western boundary along the sea increased the size of parcel 6–0 by ¾ acres. (Tr. 2, p. 43–6). Accepting Berning's explanation, the court will reject defendants' suggestion that a difference in calculated acreage proves Berning's resurvey is inaccurate.

None of defendants' three arguments concerning Berning's resurvey of parcel 6–0 appear meritorious. Accordingly, the court finds Berning's 1969 resurvey is a faithful retracing of original survey lines mapped by Harrigan. *See* Pl.'s Ex. 125. Furthermore, there is no documentary or other evidence to suggest that parcels 6–0–1, 6–0–2, or 10 fall within the bounds of parcel 6–0.

Plaintiff urges the court to adopt Berning's 1987 resurvey of parcel 6–0 (depicted on P.W.D. No. D9–4311–T88) which calculated acreage at 8.06 acres, instead of the 1969 resurvey. Yet, plaintiff has not met its burden to show why the resurvey distances and calculated acreage varies slightly from the 1969 survey. Berning did not testify concerning the change and Berning's testimony supporting the change on cross-examination

---

**34.** Defendants' offer Galiber's resurvey of the Harrigan bounds of parcel 6–0 as support for their arguments. However, Galiber merely located Harrigan's boundposts and reestablished the witness boundposts to the West as corner

posts. Since Galiber relied on Harrigan's imprecise straight lines, Galiber's survey suffers from the same infirmities that undercut Harrigan's survey. Accordingly, the court must accord Galiber's resurvey little weight.

consisted of a single line "the north bound changed." (Tr. 3, p. 30). In an attempt to understand why Berning's 1988 resurvey would differ from his 1969 resurvey, the court reviewed the record, but to no avail. No further explanation was given even though Berning's survey does not purport to uncover additional field evidence or reliable testimony of "old-timers" to support these changes. Although the changes on the later survey may be minor, the evidence before the court does not support the court's reliance on the 1987 survey. Therefore, the court rejects Berning's 1987 resurvey and instead adopts the 1969 resurvey.

### b. Title

■ Plaintiff alleges it holds one hundred percent of the ownership interests in parcel 6–0. In response, defendants argue that Irvin Sewer holds a certain interest in parcel 6–0 through Cecil Roberts, a son of Alphonso Roberts. Pl.'s Exs. 5, 191.[35]

■ In order to possess record title, a property owner must record his or her legal interest in a parcel. Documents affecting real property must be recorded in the office of the recorder of deeds. See V.I.CODE ANN. tit. 28 § 121 (Supp.1991).[36] The recorder of deeds must record all deeds of transfer of property. See V.I.CODE ANN. tit. 33 § 2362 (1967). In so doing, the recorder of deeds certifies the time when a conveyance is received. A conveyance is deemed recorded at the time it was received. See V.I.CODE ANN. tit. 28 § 123 (1976). An unrecorded conveyance is void as to subsequent good-faith purchasers. See V.I.CODE ANN. tit. 28 § 124 (1976). If a conveyance of real property was made in accordance with the laws of the Virgin Islands in force at the time of making and properly executed, then the conveyance is sufficient to convey legal title to the property. See V.I.CODE ANN. tit. 28 § 131 (1976).

■ Some of the title documents on which the court relies obviously existed prior to the modern recording statutes in force in the Virgin Islands. In particular, the 1894 and 1913 Agreements and nineteenth century deeds were "recorded" by being read aloud

---

**35.** Cecil Roberts through his representative asserts a claim to this parcel. The court will not recognize his claim.

The deed recites that all of the heirs of Alphonso Roberts were signatories, namely Zelma Roberts, Maria Roberts, Desmond Roberts, Alexandrino Roberts, Grace Roberts Dean, Louise Roberts Sewer, Samuel Sewer, Genevieve Roberts Marsh, Will H. Marsh. Defendant Irvin Sewer argues that Cecil Roberts, allegedly a son and heir of Alphonso Roberts, did not sign the deed in 1953 and thus did not convey his interest in this property. Indeed, Cecil Roberts was not a signatory to the deed. Mr. Sewer indicates that he now has a power of attorney for Cecil Roberts.

No evidence has been presented to this Court suggesting 1) that Cecil Roberts is indeed a son of Alphonso Roberts or 2) that Cecil Roberts ever demonstrated any interest in this property until the genesis of this lawsuit. In fact, although Irvin Sewer testified at trial, defendants presented no testimony with respect to this issue at trial. (Tr. 3, p. 69–103) After forty years of silence, neither Cecil Roberts nor his representative may come forward and attempt to disrupt the title of subsequent good faith purchasers. In the alternative, even if Roberts has not been divested of some property interest by operation of law after forty years, the plain language of the conveyance suggests that "all of the heirs at law and next of kin of Alphonso Roberts" relinquished their interests to parcel 6–0 in 1953. Pl.'s Exs. 5, 191.

As a result, the heirs granted the Dobbs and all of their "heirs and assigns forever, all that certain lot ... described as ... parcel 6–0." While the deed in question does not specifically state that the grantors warrant clear title, the deed's plain language strongly implies that the Roberts heirs intended to pass good and valid title permanently to the Dobbs and the Dobbs' heirs. Public policy suggests that this court should interpret this language and Cecil Robert's forty-year delay contesting the validity of the 1953 deed and subsequent conveyances, to find that any claim Cecil Roberts may have had is barred.

Even if the court were inclined to look more favorably upon Roberts' belated arguments, the court notes that Irvin Sewer is an unusual choice to act as Roberts' representative under the circumstances. Sewer's parents, Louise Roberts and Samuel Sewer, were signatories to the 1953 deed originally transferring the Alphonso Robert's property to the Dobbs. Sewer's parents specifically stated in the deed that the signatories were Alphonso Roberts' only heirs or kin. Pl.'s Ex. 5. It would be inconsistent to allow Irvin Sewer to advance Cecil Roberts' interests when his parents represented in 1953 that Cecil Roberts was not an heir of the Roberts estate.

**36.** The statute reads in pertinent part: "Documents affecting real property, which are required or permitted to be recorded, shall be recorded in the office of the recorder of deeds in the judicial division in which the property is located...."

at "St. Jan's ordinary court" and added to written registries. See Pl.'s Exs. 15, 16, 21, 173. This method of recording appears to have been the commonly accepted practice of the Danish government before 1921.[37] The court, therefore, recognizes this form of recording as valid pursuant to the provisions of V.I.CODE ANN. tit. 28 § 131 (1976), *supra.*

The documentary evidence detailed in Findings of Fact (Part B) support the court's conclusion that the Roberts portion of Longbay No. 1, known as parcel 6–0 has been described consistently and transferred as an intact parcel from 1913 to the present. Plaintiff has entered the relevant recorded deeds in evidence to establish that they hold record title to the Roberts portion of Longbay No.1, known as parcel 6–0. *See* Pl.'s Ex. 191. Consequently, the court finds that plaintiff has carried its burden and established, by a preponderance of evidence, their ownership claim to parcel 6–0. Record title to parcel 6–0 vests in Newfound.

The court notes that title vests in Newfound as located by Berning's 1969 survey and depicted on plaintiff's exhibit 125. *See* Location, *supra.* This determination very slightly reduces the size of 6–0, by .06 acre, and minimally alters a portion of the northern boundary of 6–0 and the portion of the southern boundary shared with parcel 6f.

 Finally, it is important to note that the parties did stipulate that plaintiff held record title to parcel 6–0. Joint Final Pre–Trial Order at 6. Under most circumstances, factual stipulations bind the parties. As a result of a stipulation's binding effect, a court need not address stipulated facts or issues. 83 C.J.S. *Stipulations* § 10. However, a court may review stipulations concerning questions of law, as here, or if this stipulation is construed as an admission, may interpret the stipulation to give effect to the intent of the parties to the stipulations. 83 C.J.S. *Stipulations* § 24. During trial the defendants repeatedly contested the underlying facts and legal issues to which they had already stipulated. The defendants' representations at trial suggest that they did not

intend to admit that record title vested in the parcel as located by Berning's survey.

It is obvious to the court that if the parties could not agree on the location of the parcel, the parties could not agree concerning record title to the same. Title to a parcel of land when one does not know its location can be meaningless. So as to avoid any ambiguities with regard to the stipulation, the court will take note of the stipulation but not ignore defendants' arguments concerning title. The court prefers to dispose fully of defendants' arguments on the merits rather than relying on the procedural rationale that the defendants waived their rights to contest facts or legal conclusions through stipulations. For these reasons, the court will note, as here and throughout this opinion, if a relevant stipulation exists, but will not interpret them as binding.

### 2. Parcel 6–0–1

#### a. *Location*

Newfound alleges that parcel 6–0–1 should be located as depicted on Berning's survey map filed as P.W.D. No. D9–4313–T88. Pl.'s Ex. 46. In response, the Sewer defendants and defendant Cedric Lewis only repeat their objection first raised concerning parcel 6–0 that 6–0–1 must be located within the bounds of 6–0. The defendants base their objection on their interpretation of the documentary evidence.

The legal inquiry required to locate parcel 6–0–1 is quite narrow. The questions presented are 1) whether an adequate description of the property existed to assist the location of the property on the ground and 2) whether Berning, as the original surveyor of this parcel of property, surveyed the land in accordance with accepted surveying practices. In other words, the court must determine whether Berning followed the legal description of the property, the documentary and field evidence as well as testimony of residents to locate the parcel according to the best available evidence.

---

37. From 1921 until 1976, land transfer documents concerning real property on St. John were recorded first by the clerk of the district court and then by the judge of the police court. *See* V.I.CODE ANN. tit. 28 § 128 (1976) (explanatory notes).

In 1913, this parcel of property was conveyed to Mary Elizabeth Boynes by her brothers and sisters. Pl.'s Ex. 22. The property's description stated: "our dc. [deceased] mother's shared in Long bay No. 1 . . . which is calculated to be about one acre." Pl.'s Ex. 22. Without more, this description is sparse and gives a surveyor little guidance standing alone. The only lead a surveyor would have was the designation of the property "6e," of which this parcel was a part, which locates land numbered "6" north of the George–Sewer line. Pl.'s Ex. 15. By looking at the Danish land lists, the 1913 Agreement and the genealogical data, however, a surveyor could deduce that the description refers to a one acre parcel partitioned from a three acre parcel held in common by members of the George family. *See* Findings of Fact, Part C, *supra; see also* Pl.'s Ex. 192. Berning relied on these historical documents to identify the parcel.

In addition, Berning used the testimony of old-timers to piece together and confirm information in the documents to locate the property. Berning testified that Amos Sullivan pointed out the bounds of the Mary Elizabeth Boynes property while Berning and Sullivan were in the field. (Tr. 2, p. 51–3). Specifically, Sullivan identified the northern and southern boundaries, which were marked by fencelines, the eastern boundary extending from a boundpost placed by Harrigan to a large locust tree and the western boundary which were marked by two large tamarind witness trees. Sullivan's location of the Mary Elizabeth Boynes property is further substantiated by a deed which described the adjacent property to the West, parcel 6f. *See* Pl.'s Ex. 20 and App. A. That deed, describing parcel 6f, indicates that Long bay No. 1 extended to the north and east of parcel 6f. Since the Roberts portion of Long bay No. 1, known as parcel 6–0 lay to the north, the remaining undivided three acre portion of Long bay No. 1 extended to the east of parcel 6f. Mary Elizabeth Boyne's property, therefore, also must lay east of 6f.

Defendants have not submitted evidence to effectively rebut or undermine Berning's

original survey of parcel 6–0–1. Their expert, Galiber, stated he did not conduct an independent survey of the parcel, noting that Berning was the original surveyor of parcel 6–0–1. (Tr. 3, p. 88). Since Berning was the original surveyor, even if Galiber were to complete a survey, his resurvey would be constrained by Berning's fieldwork. Under most circumstances, Galiber would be unable to change the bounds of parcel 6–0–1. In order to alter Berning's bounds, Galiber would have to identify convincing evidence in the field, documents, or testimony which suggested that Galiber's changes were *closer* to the legal description in the original conveyance.

The defendants also argue that Berning's survey must be in error because the stated acreage of Berning's parcel 6–0–1, 3.58 acres, is greater than the acreage recorded on the historical documents. As the court has noted previously, acreage is only one piece of evidence that a surveyor must combine with other information to make an informed decision where to locate a disputed parcel. *See* Conclusions of Law, Part II(A–B), *supra.* Here several monuments, fencelines, Harrigan's boundposts on the northeast corner and the tamarind trees on the western corners, plus the testimony of Amos Sullivan, determined where Berning situated parcel 6–0–1. Since surveying practices emphasize evidence of monuments in the field over a surveyor's call for acreage, Berning correctly relied on the monuments and testimony rather than stated acreage.

■■■ The court finds that sufficient information exists to determine the property's location. *See* V.I.CODE ANN. tit. 28 § 47 (1976). The court also finds that Berning surveyed parcel 6–0–1 in accordance with established surveying practices. Berning properly drew conclusions from the historical documents, informed testimony and investigative field work. This supplemental evidence substantiated the terms of the original deed. Accordingly, the court locates parcel 6–0–1 as shown on Berning's survey map filed as P.W.D. No. D9–4313–T88.[38]

---

**38.** Adopting this survey map presents an issue for the court's resolution. Pl.'s Ex. 45. At the time that Berning altered his original survey to correspond with Harrigan's survey of parcel 6p

b. *Title*

■ Plaintiff alleges it holds record title to parcel 6–0–1. It has submitted historical documents and recorded deeds demonstrating the chain of title to support its claim of ownership. *See* Findings of Fact, Part C, *supra; see* Conclusions of Law, Part V(A)(1)(b) (reviewing recording statutes), *supra.* Defendants renew their objection to Berning's location of parcel 6–0 suggesting that parcel 6–0–1 falls within parcel 6–0 and asserting an unspecified ownership interest therein. Defendants have not produced documentary or other evidence to clarify their alleged ownership interest in parcel 6–0–1.

Plaintiff has entered all of the relevant recorded deeds in evidence to verify its claim of ownership. *See* Findings of Fact, Part C(2), *supra.* Plaintiff has established its ownership interest in parcel 6–0–1 by a preponderance of the evidence. The court, therefore, finds that plaintiff has met its evidentiary burden and holds record title to parcel 6–0–1.

3. Parcel 6–0–2

a. *Location*

Plaintiff avers that parcel 6–0–2 is the Anne Marie George portion of Longbay No. 1 and should be located as shown on Berning's survey map P.W.D. No. D9–4848–T89. Pl.'s Ex. 47. *See* Findings of Fact, Part D, *supra.* Defendants allege, as before concerning parcels 6–0 and 6–0–1, that no partition of the property held in common by Ann Marie George, Mary Elizabeth Boynes and James Wellington in 1913 occurred. Pl.'s Ex. 16. Therefore, defendants suggest parcel 6–0–2, like parcel 6–0–1, does not exist.

Paralleling the legal analysis in parcel 6–0–1, parcel 6–0–2 presents two issues for the court to decide: 1) whether an adequate description of the property existed to assist the location of the property on the ground and 2) whether Berning, as the original surveyor of this parcel of property, surveyed the land in accordance with accepted surveying practices. As in parcel 6–0–1, Berning was the original surveyor of parcel 6–0–2 and the defendants' expert did not conduct a resurvey. (Tr. 1B, p. 88).

The property in question has been referred to and described in several historical documents. The only land description available to a contemporary surveyor of the property is Anne Marie George's 1921 deed to Mary Elizabeth Boynes stating,

> one (1) acre of land in the East End of St. John and known as 'LongBay' No.1 given No.6a. being a parcel from Hansen Bay A. The aforementioned parcel is contiguous with a lot purchased by Mary Elizabeth Boynes from her brothers and sister Denis George, Oswald George, William E. George and Amelia Smith (George).

Pl.'s Ex. 12. By itself, the description is minimal. When considered in light of other documents including the 1913 Agreement, *see* Pl.'s Ex. 16, a court record summarizing Ann Marie George's real estate holdings at her husband's death in 1913, *see* Pl.'s Ex. 135,

---

to the south, *see* Findings of Fact, Part C, *supra,* Newfound was not the only owner of parcel 6–0–1. In the absence of an agreement between all of the owners of real estate, an owner with a less than fee simple interest in the property may not alter a boundary line or accept a new boundary line. This rule is well-established and protects tenants in common from having their ownerships interests alienated without notice.

In this case, Newfound asserts that it accepted Harrigan's boundary in an attempt to accommodate a neighbor's interest, avoid litigation and ensure that future boundary disputes would not arise. These are clearly worthy goals but Newfound may not singlehandedly bind other owners and require them to recognize a boundary line to which all owners have not agreed.

Nevertheless, Newfound currently holds all ownership interests in the property. *See* Title,

*infra.* The very small shift in the boundary, diminishing the size of parcel 6–0–1 by only .01 acre, occurred before the owner of two-thirds of the ownership interests sold her interest to Newfound. She conveyed her interest to Newfound referring to the later Berning map. Pl.'s Exs. 8, 46. Since she conveyed her interest according to the survey reflecting the new southern boundary, the court finds that she had adequate notice of the change and could have bargained appropriately to protect her interest in the original bounds before she agreed to the conveyance. Since the owner whose property interests were affected by Newfound's acceptance of the new boundary had notice of the change and Newfound currently possesses the property in fee simple absolute, the court will recognize the later Berning survey as properly locating the parcel.

and a probate record adjudicating her estate, *see* Pl.'s Ex. 126, this description becomes more meaningful.

Berning testified that he relied on these documents to locate parcel 6–0–2. The documents revealed that the parcel had to be contiguous with parcel 6–0–1. Since parcel 6–0, the former Roberts property, is north and parcel 6–0–1 is to the west (east of 6f), he concluded that parcel 6–0–2 is situated directly east, sharing its western boundary with parcel 6–0–1. (Tr. 2, p. 55–59).

Having established the western boundary, Berning sought to identify the eastern boundary of 6–0–2 through testimony and field evidence. Berning relied on statements by Harry Sewer, grandson of a signatory to the 1894 Agreement and former resident of the East End, to situate parcel 6–0–2. On a field visit, Sewer identified the Boynes property, indicating that Mary Elizabeth Boynes had a house on the hill near the boundary of 6–0–2 and 6y. Sewer stated to Berning that he and Boynes spoke over the fenceline separating 6–0–2 and 6y when he was young. (Tr. 2, p. 56; Tr. 3, p. 41–42). After a search of the general area indicated by Sewer, Berning did not find evidence of the house. (Tr. 3, p. 46). Berning, however, identified a fence along the ridgeline marking the boundary of parcel 6y and inferred that the fence was the eastern boundary of 6–0–2. (Tr. 2, p. 56). Since V.I. surveyors relied on ridgelines as natural boundary lines, the combination of the fence and the ridgeline corroborates Sewer's statement regarding 6–0–2's eastern bound. *See* Conclusions of Law, Part III, *supra.*

To set the southern boundary, Berning adopted the northern boundary of his original survey of parcel 6p, relying on Bernard Williams' representation, as an owner, that 6p lay to the south. Def'ts Ex. D1–A; *see also* Pl.'s Ex. 161.[39] The line also accords well with the evidence of a fenceline that extends south along the contiguous parcel 6–0–1, merely continuing the line to the east in a more or less straight line. Pl.'s Ex. 47. At present, Bernard Williams' representative,

defendant Cedric Lewis, disputes 6–0–2's location. Nevertheless defendants have not put forth evidence suggesting that Williams was mistaken or indicating that the southern boundary of parcel 6–0–2 lay elsewhere. Thus the court will accept Williams' representation as true.

As in the case of parcel 6–0–1, defendants raise the issue of a difference in acreage. Again the deed refers to a one-acre parcel of land and Berning's survey calculates a greater number, 2.28 acres. Pl.'s Ex. 47. The court has already disposed of defendants' argument with respect to acreage and will not reiterate it here. Acreage remains the least significant identifying characteristic of property, especially when the property in question was rural property first identified as a distinct parcel around the turn of the century.

In attempting to locate a poorly described parcel, Berning assembled and reviewed the relevant documents, tried to identify whatever field evidence still existed on the ground and conferred with a knowledgeable person. It is apparent that Berning evaluated the best available evidence in accordance with proper surveying conventions, noting monuments and natural topographical features. It is also apparent that the defendants have not put documentary evidence or expert testimony before the court which undermines Berning's survey.

■ The court finds that the meager property description, viewed in combination with the other evidence that Berning assembled, is sufficient to support the court's determination that parcel 6–0–2 is a distinct and identifiable property. Moreover, plaintiff has met its burden of proof with respect to parcel 6–0–2's location and defendants have not adequately responded. As a result, the court finds that Berning properly located and depicted parcel 6–0–2 on the survey filed as P.W.D. No. D9–4848–T89. Pl.'s Ex. 47.

b. *Title*

■ Plaintiff alleges it holds record title to parcel 6–0–2. It has submitted relevant

---

**39.** This is the same boundary a surveyor from C.A. Hamilton & Associates adopted later to es-

tablish the bounds of parcel 10. Pl.'s Ex. 40.

documents and recorded deeds confirming the chain of title in support of its ownership claim. *See* Findings of Fact, Part D(2), *supra; see also* Conclusions of Law, Part V(A)(1)(b) (reviewing recording statutes), *supra*. No evidence has been presented to challenge the authenticity of the deeds; indeed, defendants signed a stipulation admitting that plaintiff has record title to the parcel at issue. *Joint Final Pre–Trial Order* at 6. Plaintiff has established its ownership interest in parcel 6–0–2 by a preponderance of the evidence. Accordingly, in the absence of contrary evidence, the court finds that plaintiff holds record title to parcel 6–0–2.

### 4. Parcel 6f

#### a. *Location*

Plaintiff submits that parcel 6f, the Martin Sewer portion of Longbay No. 1, is located as shown on the V.I. Engineering survey filed as P.W.D. No. D9–4313–T88. Pl.'s Ex. 46. Defendants respond that, like parcel 6–0–1 and 6–0–2, parcel 6f is improperly located and must exist within the boundaries of parcel 6–0. *See* Findings of Facts, Part E, *supra.*

Defendants do not effectively challenge Berning's survey of 6f, his surveying techniques or his interpretation of field and other evidence. For example, defendants offered no resurvey to rebut Berning's assertions. Defendants merely reiterate, repeatedly, their general objection to Berning's location of parcel 6f. This general objection depends entirely on Galiber's incorrect survey of the George–Sewer line.

The questions before the court are whether Berning relied on a legally sufficient description of parcel 6f and, having fully researched the location of parcel 6f, located the parcel according to the best available evidence. Parcel 6f was originally surveyed by Anderson as part of the 1894 Agreement between the George and Sewer families. Pl.'s Ex. 15. Unfortunately, Anderson did not provide a map or written account of his survey of 6f. The 1894 deed conveying parcel 6f to Martin Sewer stands as the only written record of the parcel's location. As a result, Berning in performing a resurvey, sought to retrace Anderson's footsteps, relying on the deed description and available testimonial and field evidence.

To identify parcel 6f's location, Berning began with the 1894 deed description: "North and East boundary. The south boundary of Longbay No.1. West. The Bay. South. The boundary of Christian Hugh. Viz: Longbay No. 2." Pl.'s Ex. 20. This description is legally sufficient under the circumstances. The deed's reference to parcel 6f's northern and eastern boundaries reflects Anderson's division of the property and the new bounds of Longbay No. 1. Historical documents including the 1894 Agreement, indicated that parcel 6f lay southwest of the parcels presently known as 6–0, 6–0–1, 6–0–2, and an unknown remainder to the east or southeast. Armed with that knowledge and with the help of Amos Sullivan, a long-time resident, Berning conducted a field survey, identifying all four original boundaries of the parcels. Berning relied on artificial and natural monuments pointed out by Amos Sullivan, namely the northern and southern fenced boundaries, and large tamarind trees on the eastern boundary. (Tr. 3, p. 60–63). Sullivan's knowledge of these fences, to the north and south, as title lines persuades the court that Berning's properly relied on these artificial monuments to reset the northern and southern bounds. Berning's testimony reflected that Sullivan had few doubts concerning where parcel 6f lay. In addition, Sullivan's understanding of the significance of the southern boundary fence was confirmed by another property holder, Bernard Williams. Williams, whose interests are represented by defendant Cedric Lewis in this suit, confirmed the southern boundary of parcel 6f as the northern boundary of Williams' parcel 6p. Pl.'s Ex. 172. This confirmation accords with the deed's call for the Christian Hughes property, known as 6p, to the south.

With respect to the eastern boundary, neither the documents relating to parcel 6f or 6–0–1 specifically identify its location. Nevertheless, Sullivan's identification of the tamarind trees as marking the eastern boundary is meaningful. Given Berning's belief that Sullivan knew parcel 6f's exact bounds, Bern-

ing reasonably relied on natural monuments, the tamarind trees, to set the eastern boundary.

Berning also properly located the only remaining boundary to the West. Berning set the western boundary at the mean high water mark of the shoreline, consistent with the deed description's call for "The Bay". *See* Conclusions of Law, Part V(A)(1)(a), *supra* (discussion of shoreline boundaries).

 In summary, Berning relied on the property description, other relevant documentary evidence, gathered information from knowledgeable "old-timers," conducted field research and identified existing field evidence to locate parcel 6f. By assembling the best available data and surveying parcel 6f accordingly, Berning followed established surveying practices to resurvey parcel 6f's original boundaries. The court finds Berning's testimony and analysis of evidence credible and adopts his work.

Defendants do not present contrary evidence to challenge Berning's survey. They did not offer another expert's resurvey, or other evidence, to undermine Berning's analysis of field, documentary or testimonial evidence. Defendants merely offer their general objection that Berning mislocated both the George–Sewer line and parcel 6f. The court has already accepted the B–C–D segments of the George–Sewer line, finding defendants' reliance on Galiber's version of the George–Sewer line to be misplaced. As a result, the court finds that plaintiff, rather than defendants, has persuaded the court regarding parcel 6f's original location.

The court will adopt the boundary lines of the earlier of the two Berning surveys as parcel 6f's proper bounds. Pl.'s Ex. 172. The difficulty with the later survey, filed in 1988, is that the bounds reflect small changes unilaterally agreed to by only one owner, plaintiff's predecessor-in-interest, although the property was held as a tenancy in common. The changes in the bounds led to a slight increase of .01 acre in parcel 6f's total acreage. Berning did provide an explanation at trial for the change to the southern boundary, referring to Louis Harrigan's survey of 6p. Berning indicated that Newfound's predecessor-in-interest preferred to conform the southern boundary to the Harrigan survey rather than have two conflicting surveys in existence. *See* Conclusions of Law, Part V(A)(2)(a) n. 38, *supra.* At trial, Berning did not provide an explanation why the northern or eastern bounds changed slightly. (Tr. 2, p. 60–1). While none of these changes are significant in terms of acreage, or even alter the boundaries in any substantive way apparent to the court, neither Newfound's predecessor-in-interest nor Berning could change the parcel's resurveyed boundaries without the mutual agreement of all tenants in common.[40] When Berning filed the later survey in 1988, the changes to the boundaries were not approved by those Sewer heirs with likely ownership interests in the property. Pl.'s Exs. 46, 194 [survey drawings and genealogical charts]. Therefore the court finds that parcel 6f's proper boundaries are depicted on plaintiff's exhibit 172.

b. *Title*

Plaintiff asserts partial ownership of 86.36363% of the identified ownership interests in parcel 6f. In addition plaintiff denies that the defendants have any claim to parcel 6f with two exceptions. Newfound concedes that two defendants, Irvin A. Sewer and Violet Sewer Mahabir, have ownership claims sharing a two percent interest in parcel 6f.

 Newfound asserts partial ownership of 6f based on a series of recorded conveyances from numerous Martin Sewer's heirs. *See* Findings of Facts, Part E(2), *supra; see also* Conclusions of Law, Part V(A)(1)(b) (reviewing recording statutes), *supra.* Newfound has presented quitclaim deeds from the Sewer heirs to substantiate its claims to Martin Sewer's parcel 6f. Al-

---

**40.** On occasion, convincing new evidence may come to light suggesting that a boundary line could be redrawn to more closely reflect the *original* boundary line. Under certain conditions a surveyor could alter survey lines accordingly provided such a change would not undercut the settled expectations of subsequent good-faith purchasers or adjacent owners. This sort of change would be appropriate where clear evidence suggests that a surveyor has made an error that should be corrected.

though evidence of testacy or surviving spouses or issue would be relevant and material to the court's determination of ownership, defendants did not present evidence suggesting that Martin Sewer or any of his heirs died testate or that Sewer or his heirs disposed of the property in some other fashion. Indeed, Irvin Sewer has stated that Martin Sewer's real property did pass through intestacy, with his heirs holding the property as tenants in common. *See* Findings of Fact, Part E(2)(c), *supra; see also* V.I.CODE ANN. tit. 28 § 8 (1976) [41]. Unable to rely on any evidence to the contrary, the court holds that title to Martin Sewer's parcel 6f passed through intestate distribution to his heirs at law.

The court would have also considered evidence, if it had been submitted, that Newfound's genealogy was incomplete or incorrect. The defendants did not, however, challenge the genealogical charts submitted by plaintiff. Based on the good faith representations of Newfound and in the absence of any such challenge by defendants, the court finds that the parties who executed quitclaim deeds in favor of Newfound Corporation did indeed possess ownership interests in 6f in accordance with their respective status as intestate distributees.

Except for defendants Irvin Sewer and Violet Sewer Mahabir who hold Felix Sewer's interest in parcel 6f, none of the other defendants have presented evidence substantiating ownership claims to this parcel. Since the court has no testimonial or documentary evidence to the contrary, the court finds that among the defendants only Irvin Sewer and Violet Sewer Mahabir possess an ownership interest as heirs at law in parcel 6f.

The Virgin Islands Code provides for intestate distribution of real property as follows:

> The real property of a deceased person, male or female, not devised shall descend, and the surplus of his or her personal property, after payment of debts and legacies, and if not bequeathed, shall be distributed to the surviving spouses, children, or next of kin or other persons, in manner following:
>
> (1) One-third to the surviving spouse, and the residue in equal portions to the children, and such persons as legally represent the children if any of them have died before the deceased.
>
> \* \* \* \* \* \*
>
> (6) If there be no surviving spouse, the whole thereof shall descend and be distributed equally to and among the children, and such as legally represent them;
>
> \* \* \* \* \* \*
>
> (9) When such distributees are of unequal degrees of kindred, the whole shall descend and shall be distributed to those entitled thereto, according to their respective stocks; so that those who take in their own right shall receive equal shares, and those who take by representation shall receive the share to which the parent whom they represent, if living, would have been entitled.

V.I.CODE ANN. tit. 15 § 84 (1964); *see also* former Virgin Islands Code of 1921, Title 15, Chapter 16. The Virgin Islands' 1921 Code, Title II, ch. 16 was revised by V.I.CODE ANN. tit. 15 § 84 in 1964. Under either statute, Martin Sewer's parcel 6f would have been distributed equally among his five children [42]

---

41. Where property descends by operation of law to more than one distributee, the distributees take as tenants in common. The statute reads in pertinent part:

> Where there is but one person entitled to inherit he [sic] shall take and hold the inheritance solely; when an inheritance or a share of an inheritance descends to several persons they shall, except as otherwise provided in section of this title, take as tenants in common, in proportion to their respective rights.

V.I.CODE ANN. tit. 28 § 8 (1976).

42. Based on the record before the court, the affirmative evidence demonstrates that title passed to the issue of Martin Sewer's heirs rather than to both issue and surviving spouses. If there were such a surviving spouse, his or her existence would probably alter the distribution of the respective heirs' property interests. The defendants have not offered *any* evidence controverting Newfound's factual representations regarding the existence of surviving spouses. Defendants, not the court, have access to this kind of genealogical information and would be the proper parties to provide it to the court. The

and if Sewer's children had issue, the issue would have taken by right of representation. Thus, based on the court's finding that Sewer's estate was distributed, not devised, each son or daughter gained a 20% interest in the property. Newfound holds through quitclaim deeds Mortimer Sewer's interest (20%), Ruth Sewer Roberts' interest (20%), and Daisy Sewer Stevens' interest (20%). In addition, Newfound holds the interests of Samuel Sewer's nine (out of eleven) children (9 × 1.818% = 16.36363%) and the interests of Conrad Sewer's five (out of ten) children (5 × 2% = 10%) for a total of 86.36363%. As a result of Conrad Sewer's son, Felix Sewer's, quitclaim deed to defendants Irvin Sewer and Violet Sewer Mahabir, they share a two percent interest in parcel 6f.

Thus, pursuant to the Virgin Islands statutory provisions regarding intestacy, the Court finds that plaintiff Newfound holds 86.36363% and defendants Irvin Sewer and Violet Sewer Mahabir hold in common two percent of the identified ownership interests in Martin Sewer's parcel 6f. The rest of the ownership interests are unidentified.

### 5. Parcel 6y

#### a. *Location*

Newfound states parcel 6y is located as shown on P.W.D. No. B9–425–T74. Pl.'s Ex. 65. Defendants have not disputed the location of the property and, rather than challenging P.W.D. No. B9–425–T74 seem to adopt at least its southern boundary. (Tr. 2, p. 193). The court has already articulated detailed findings with respect to Berning's review of the documentary and historical evidence relating to this parcel. *See* Findings of Fact, Part F, *supra*. Since the defendants' arguments are limited to title claims rather than disputes concerning location, the court will not further analyze the sufficiency of the legal description or the surveying techniques used to locate parcel 6y at length.

Briefly, the survey in question is a resurvey of a 1912 original survey that provides, surprisingly, a relatively complete description, including calls for natural monuments. The contemporary surveyor closely followed the description, identifying some of the called-for monuments, relying on identifiable topographical features as well as references to adjacent properties to locate the parcel. Pl.'s Exs. 69, 195. In addition to the field evidence, the surveyor relied on statements of former residents to support parcel 6y's location. The court's conclusion, in accordance with its findings, is that the resurvey of 6y was performed according to accepted surveying practices and drew on the best evidence available. The court concludes that 6y lies as depicted on P.W.D. No. B9–425–T74.

#### b. *Title*

Plaintiff states it has record title to parcel 6y. In response, defendants argue that plaintiff has a less than one hundred percent ownership interest in the property. However, defendants neither estimate how much less than one hundred percent plaintiff may legitimately claim nor assert any ownership claims of their own.

To establish its title claims Newfound has collected and recorded deeds from each heir or her representative totalling one hundred percent of all ownership interests in parcel 6y. The original owner of parcel 6y, Richard Stevens, devised his fee simple absolute interest to three of his children, Christina, Joshua, and Consuela. While defendants do not dispute the chain of title relating to Christina or Joshua's interests, the defendants allege that Newfound has not obtained title to Consuela's interest in the property. In the present action, Enid Francis, acting as guardian ad litem for Consuela Stevens Francis, conveyed by warranty deed her mother's undivided one-sixth interest in parcel 6y. As a result of signing the deed, Enid Francis warranted that she, as grantor, had clear title to pass to grantee, Gulf Caribbean Development Corporation.

■ Although Enid Francis purported to convey record title to Newfound, the Sewer defendants challenge the conveyance as improper, essentially asserting Enid Francis breached her fiduciary responsibilities as guardian ad litem. Defts' Suppl. Findings of

court must, therefore, take Newfound's uncontested representations as true.

Facts at 5. Indeed, the Virgin Islands have specific procedural requirements which must be met before a guardian may sell a ward's real estate. The relevant statutory provisions require the guardian to formally petition the court overseeing the guardianship to demonstrate the need for the sale and obtain court approval, give public notice of the sale, and take an oath promising to dispose of the property in the most advantageous manner to benefit interested persons. *See* V.I.CODE ANN. tit. 15, § 912, 915, 918, 919 (1964). Relying on the statutory mandate that any conveyance of a ward's real property requires a court order approving such a sale, the Sewer defendants argue that Enid Francis had no such court approval and, as a result, the grantee, Gulf Caribbean, did not possess a valid interest in 6y to convey to plaintiff Newfound. Pl.'s Ex. 61, 78.

Nothing in the record counters defendants' assertion that Enid Francis did not follow the necessary statutory requirements to sell her ward's real property interest in parcel 6y. The only documents in the record relating to the sale of the ward's interest in 6y were the petition for guardianship and the order recognizing Enid Francis' appointment.[43] The record does not contain a court order approving the sale nor any indication that the guardian took an oath or gave notice of the sale.

If the sale was improper and a person claiming through Consuela Stevens Francis sought to challenge the sale, the proper party could recover from the guardian, using a statutory remedy set forth at V.I.CODE ANN. tit. 15 § 926 (1964). Pursuant to this provision, if the guardian does not follow the statutory requirements and a party claiming through the ward is injured by a guardian's misconduct or neglect, then the aggrieved party may recover in an action against the guardian. *Id.*

The court must, however, refrain from reaching the issue of the propriety of Enid Francis' conveyance because the Sewer defendants should have first considered whether or not they could properly raise this question before the court. The court cannot entertain objections to a guardian's actions in the absence of proof that the objecting party has suffered damages relating to a lawful claim through the ward. Defendants do not assert an ownership interest in parcel 6y that they defend as heirs of Consuela Stevens Francis by questioning the legitimacy of Francis' conveyance. In fact, defendants have not submitted any documentary evidence or put on any testimony to demonstrate that any defendant may lawfully claim an interest in parcel 6y through Consuela Stevens Francis.[44] While the court appreciates the Sewer defendants' efforts to alert the court to possible irregularities relating to the guardianship, the Sewer defendants simply do not have the standing to challenge Enid Francis' conveyance.

Even if Enid Francis' conveyance was improper, defendants overlook the importance of her signature on a warranty deed conveying Consuela Stevens Francis' interest. A grantor who conveys real property by warranty deed covenants to pass clear title. In signing the warranty deed, the grantor assures the grantee that the grantor will warrant and defend title to the conveyed real estate against others who may assert claims against the property. Warranty deeds therefore differ from quitclaim deeds by which a grantor merely conveys a release of a lawful claim or interest in property that the

---

43. It troubles the court that the petition for guardianship itself averred that the ward had been incapable of conducting her affairs for two years but simultaneously stated, as a reason for the appointment, that Consuela Stevens Francis had signed and was bound by an alleged contract of sale of her interest in parcel 6y for $30,000 and 120 shares of Newfound Corporation stock. The guardian may have, however, merely been seeking to honor her mother's commitments and therefore sought the appointment. Pl.'s Ex. 190. In any case, this issue is not properly before the court.

44. Defendants only argued generally that Newfound does not have valid title to parcel 6y.

Your Honor, counsel [for the plaintiff] mentioned that there was no evidence submitted as to 6-Y. I would like to first discuss 6-Y, because I can do so very briefly and get through it. I would submit to the Court that the position of the defense, of the defendants, is that merely that [sic] Newfound does not have 100% of 6-Y.

(Counsel for the Sewer defendants, Tr. 3, p. 115.)

grantor may possess. Thus, through obtaining a warranty deed from a grantor, a purchaser of real property may rely on grantor's assurances that the purchaser possesses valid title.

When Enid Francis signed a warranty deed she promised to warrant and defend the title she passed to Gulf Caribbean. Her actions constituted a representation that she could, on behalf of Consuela Stevens Francis, convey clear title to Consuela's undivided interest in parcel 6y. Pl.'s Ex. 61. Subsequent purchasers of the property, Newfound Corporation and Newfound Limited Partnership also received deeds which warranted clear title subject only to certain restrictions not at issue here. Pl.'s Ex. 11, 78.

■ As a result of the terms of these deeds, if an individual properly claiming to be a real party in interest to Consuela Stevens Francis' estate sought to challenge Enid Francis' actions as guardian and Newfound's title to 6y, Newfound would defend its title based on Enid Francis' warranty and the warranties of the other subsequent purchasers. Accordingly, since there is no party at interest in the present case and Newfound may have a valid defense to such claim even if brought by the correct party, the court has no reason to doubt, on the basis of the record before it, that Newfound possesses record title to the entirety of 6y.

### 6. Parcel 6z

#### a. *Location*

Plaintiff Newfound alleges that parcel 6z, Martin Henry Boynes' property, is located as drawn on P.W.D. No. B9–243–T69. Pl.'s Ex. 65. Defendants are largely silent in response.

As with parcel 6y, the court has set forth specific findings summarizing the steps Berning took to resurvey this parcel and the evidence, descriptive, documentary, testimonial and physical, Berning relied upon to confirm the parcel's perimeter. *See* Findings of Facts, Part G, *supra.* The court's findings reveal a comparatively complete nineteenth-century deed description, sufficient to provide 6z's 1969 surveyor, a Berning associate, with reasonable guidance. Moreover, the

1969 survey warrants reliance because the surveyor completed the survey in the company of residents and landowners. Finally, defendants do not oppose the 1969 survey, neither challenging its accuracy nor offering a survey or other evidence to contradict the survey. Since, a detailed legal description of the property exists that a surveyor identified on the ground according to standard surveying techniques, only one issue remains for the court's determination.

■ The only remaining issue raised by the survey in question, not previously addressed in this opinion, is whether adjacent owners who share a disputed boundary may agree upon a boundary to establish that the agreed-upon boundary is a *title* line. If a dividing line is agreed upon by adjacent owners and a survey memorializes this agreement, the evidence of a verbal agreement and the owners' subsequent acquiescence in the line are persuasive proof that the dividing line is a title line. *Bemis v. Bradley*, 126 Me. 462, 139 A. 593, 594 (1927); *see also* 11 C.J.S. *Boundaries* § 86.

■ Here adjacent owners were present when a surveyor conducted an original survey of parcel 6z and signed each boundary of the finished survey map indicating their collective assent to parcel 6z's boundaries. The owners' assent warrants deference in light of their greater knowledge of parcel 6z's historic bounds. Moreover, their agreement and 6z's bounds have existed for more than the statutory fifteen year period and should remain undisturbed. V.I.CODE ANN. tit. 28 § 11 (1976) ("uninterrupted, exclusive, actual, physical, adverse, continuous, notorious possession of real property under claim or color of title for fifteen years ... [presumptively gives] title"). Since there was no prior documented boundary line or a fence denoting the perimeter of parcel 6z, residents and owners were the best source of information concerning its bounds as set forth in the 1879 conveyance to Martin Henry Boynes. The court finds that the adjacent owners expressly consented to the boundary lines depicted on P.W.D. No. B9–243–T69. Accordingly, the court so locates parcel 6z.

### b. *Title*

Plaintiff avers it holds record title to parcel 6z. Defendants dispute plaintiff's ownership claims but do not estimate plaintiff's legitimate ownership interest or, affirmatively assert which defendant has an ownership interest or the extent of that interest.

To document its chain of title, plaintiff has entered into evidence a sequence of recorded warranty and limited warranty deeds. *See* Findings of Fact, Part G(2), *supra; see also* Conclusions of Law, Part V(A)(1)(b), *supra* (reviewing recording statutes). Moreover, in the joint final pre-trial order, defendants stipulated that Newfound holds record title to parcel 6z. Through the recorded deeds, plaintiff has met its burden to demonstrate its title claim by a preponderance of evidence. The court concludes that plaintiff holds record title to parcel 6z.

### 7. Parcel 10

#### a. *Location and Title*

Plaintiff asks the court to locate parcel 10 by adopting a survey of the property by C.A. Hamilton & Associates filed as P.W.D. No. D9–2468–T83. Pl.'s Ex. 40. Defendants respond to plaintiff's request by challenging Berning's positive evaluation of Hamilton's survey. (Tr. 2, p. 157–160, 168). However, none of the parties in their trial briefs affirmatively argue that they assert an ownership interest in parcel 10.

 The issue before the court is whether the court should locate or determine title to a parcel of land in which neither party claims an ownership interest or claims to hold record title. This court may assert jurisdiction over boundary disputes and the location of property, pursuant to V.I.CODE ANN. tit. 28 § 372 (1976), when a controversy between *owners* exists. At this time, the court does not need to determine parcel 10's boundaries at this time because as between this plaintiff and these defendants, there exists no controversy regarding ownership. In the absence of a live controversy, the court will refrain from merely attempting to make the survey maps of the East End more congruous by locating the parcel.

Newfound asserts no interest in the property that could lead to a dispute. On the other hand, defendants purported interest in this parcel emerges through their claim of ownership to parcel 6p, not parcel 10. Yet defendants cannot locate 6p on the ground because no conclusive survey has been performed. *See* Conclusions of Law, Part III(A)(1), *infra* (location of parcel 6p). As long as parcel 6p's location is in dispute, defendants do not possess any ownership interest in the property surveyed as parcel 10. The court need not reach any other determination regarding this parcel at this time.

### III. Location and Ownership of Parcels 6P and 7A

#### A. Parcel 6p

##### 1. *Location*

Pursuant to a consent decree entered by this court in a related action, *Eric Christian, Sr., as Administrator of the Estates of James George Sewer,* Prob. No. 398–1980 (D.C.V.I. June 2, 1994), the court ordered that this parcel should be surveyed to identify its proper location. This should occur without delay.

The court recognizes that there are at least four existing survey maps depicting this area. Pl.'s Ex. 41, 160, 161, & 162. Whoever the defendants, Cedric Lewis and Irvin Sewer, designate as surveyor should review these maps, attempt to identify as many descriptive historical documents as possible, solicit statements from knowledgeable persons and conduct the field work necessary to locate this parcel. The surveyor's goal shall be to assemble the best available evidence, evaluate and weigh any conflicting information and, then, following accepted surveying practices, determine parcel 6p's correct boundaries. It is important, in order to encourage an end to hostilities between East End neighbors, that the surveyor identify and acknowledge the boundaries of adjacent parcels. The surveyor should notify adjacent property owners when filing the survey, particularly if the surveyor believes his or her

survey would conflict with adjacent property owner's boundaries.[45]

### 2. *Title*

Plaintiff does not assert an ownership interest in parcel 6p. Defendants correctly state that the consent judgment entered by this court on June 2, 1994 awarded parcel 6p to the estate of Bernard Williams, represented by Cedric Lewis, and Irvin Sewer, for the heirs of Martin Sewer. *Eric Christian, Sr., as Administrator of the Estates of James George Sewer,* Prob. No. 398–1980 (D.C.V.I. June 2, 1994). Although plaintiff attempts to raise objections to this disposition, the court will not entertain these arguments from a party that does not assert a title claim.

### B. Parcel 7a

#### 1. *Location*

Plaintiff proposes that parcel 7a be situated as depicted on plaintiff's composite map. *See* App. A.; Pl.'s Ex. 199. Defendants assert that a survey must be performed before the parcel is located, in accordance with the court's order of June 2, 1994. *Eric Christian, Sr., as Administrator of the Estates of James George Sewer,* Prob. No. 398–1980 (D.C.V.I. June 2, 1994).

The court has made certain findings of fact that relate to parcel 7a's location. The court's findings with respect to parcel 7a's historical western boundary, draw on a combination of field evidence of old fencelines and statements by Harry Sewer, grandson of Martin Sewer. Taken together, this evidence strongly suggests that the original boundary line between 7a and 7b followed a natural ridge and was fenced. *See* Findings of Fact, Part J, *supra.* As the court explained previously, early divisions of property often followed natural topographical features. *See* Conclusions of Law, Part III, *supra.* The presence of barbless fencing conclusively shows that the fence remnants are old, perhaps dating from the turn of the century.

The underlying problem with locating parcel 7a's western boundary is that property thought to be part of the adjoining parcel to the West, known as 7b or Water Rock, actually appears to be located within parcel 7a. Two recorded surveys by Floyd George subdividing parcel 7b, extend parcel 7b into what was probably originally parcel 7a. See Pl.'s Ex. 175, 177. To further complicate matters, the property has been conveyed repeatedly based on the recorded surveys. Pl.'s Ex. 198. Even though plaintiff has presented compelling evidence of the historic boundary, the court would urge the surveyor of parcel 7a to adopt Floyd George's eastern boundary line for George's parcel No. 3. Pl.'s Ex. 177. This line acts as a partition, and even if historically incorrect, has been relied on by subsequent purchasers not parties to this lawsuit since George filed his survey in 1965.

For the purposes of defining and assigning percentages of ownership interest in parcel 7a, the court will rely upon the approximate acreage quantities Berning calculated and recorded on his composite map. *See* Appendix A.

#### b. *Title*

The court has already made a finding based on the *Eric Christian* consent agreement quieting title in favor of Newfound, Cedric Lewis, as representative of the Bernard Williams estate, Irvin Sewer, and Violet Sewer. Newfound now asserts, by virtue of a de facto partition of parcel 7a, that the court should distinguish between upland acres and the acres under Salt Pond when determining proportionate title interests. Newfound argues essentially that Adelaide Williams' successors-in-interests' conveyances of 7b improperly conveyed property belonging to parcel 7a because of mistake concerning the boundary between 7a and 7b. In so doing, they conveyed out valuable upland acres of 7a. Consequently, Newfound's argument goes, parcel 7a has fewer upland acres than it should. As a result, Newfound concludes, the court's title determinations,

---

**45.** Berning testified that Virgin Island surveyors are now required to notify adjacent owners when recording a survey. (Tr. 3, p. 184) The court *fully* endorses this practice. Early and clear notification would ensure that adjacent land owners communicate concerning shared boundaries.

estimating each owner's percentage interest, should reflect that Adelaide Williams' successors-in-interest already conveyed out a portion of their interest in the upland acreage of parcel 7a.

Defendants do not respond to Newfound's argument.

The court concludes that there is no reason to distinguish in this case between upland and lowland acres when determining ownership interests. The owners share the total acreage of the parcel as tenants in common according to their proportionate interests. There is no persuasive rationale for distinguishing between the upland acreage and the acreage represented by the pond. Consequently, to award a greater percentage of the upland acres to Newfound and Irvin Sewer and Violet Sewer and a lesser percentage to Bernard Williams' representative would be arbitrary and contrary to the essential character of tenancies in common. Consequently, the court quiets title to parcel 7a vesting 72.42031% of all ownership interests in Newfound, 8.77147% in Irvin and Violet Sewer, and 18.80821% in the Estate of Bernard Williams.

CONCLUSION

For the foregoing reasons, the court has located parcels 6–0, 6–0–1, 6–0–2, 6f, 6y and 6z. The court will not, at this time, locate parcels 10, 6p or 7a. The court has also identified record title holders for each disputed parcel where appropriate. This case will now go to trial on the merits of plaintiff's underlying causes of action. An appropriate order will be entered.

**ORDER**

This matter having come before the court for the determination of boundaries and title to disputed parcels of property; and

The court having held a trial on these matters from October 3 to October 5, 1994; and

The court having reviewed the submissions of the parties and entire record of the case; and

The court having entered pursuant to Federal Rule of Civil Procedure 52(a) its findings of facts and conclusions of law in the Opinion filed on this date;

It is on this 27th day of March, 1995 hereby **ORDERED, ADJUDGED,** and **DECREED** that:

1. The B–C–D segment of the George–Sewer line lies substantially as drawn in Appendix A by Marvin Berning, surveyor.

2. The court locates parcel 6–0 as depicted by Berning's survey map submitted as plaintiff's exhibit 125.

3. The court locates parcel 6–0–1 as depicted by Berning's survey map filed as P.W.D. No. D9–4313–T88.

4. The court locates parcel 6–0–2 as depicted by Berning's survey map filed as P.W.D. No. D9–4848–T89.

5. The court locates parcel 6f as depicted by Berning's survey map filed as P.W.D. No. G9–1668–T70.

6. The court locates parcel 6y as depicted on P.W.D. No. B9–425–T74.

7. The court locates parcel 6z as depicted on P.W.D. No. B9–243–T69.

8. The court neither locates parcel 10 nor determines the ownership of parcel 10.

9. Newfound Management Corporation holds record title to the following parcels as located above: parcel 6–0, 6–0–1, 6–0–2, 6y and 6z.

10. Newfound Management Corporation holds 86.36363% of the identified ownership interests in parcel 6f; Irvin Sewer and Violet Sewer hold 2.0% of the identified ownership interests in parcel 6f. Newfound Management, Irvin Sewer and Violet Sewer hold these ownership interests as tenants in common.

11. Title to parcel 6p is quieted in favor of the Estate of Bernard Williams, represented by Cedric Lewis, and Irvin Sewer, for the heirs of Martin Sewer; however, the property is to be located specifically by survey.

12. Title to parcel 7a is quieted in favor of Newfound, Irvin Sewer and Violet Sewer, and the Estate of Bernard Williams, represented by Cedric Lewis, as tenants in common, holding 72.42031%,

8.77147%, and 18.80821% of all ownership interests, respectively.

13. Having resolved these boundary and title issues, the court will proceed to try plaintiff's claims of trespass, libel, slander, slander of title, and intentional interference with business relations.

14. The trial of the claims set forth in the paragraph above is hereby set for the week of July 10, 1995.

APPENDIX A